UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| LISA LAPP, as<br>Administrator of the<br>Estate of Christopher Lapp,<br><br>and<br><br>J. L., a minor, by her mother<br>and next friend LISA LAPP,<br><br>     Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br>Serve:  U. S. Attorney, E. D. Va.<br>       U. S. Attorney General<br><br>and<br><br>DEAN INOUYE<br>720 N. St. Asaph Street<br>Alexandria, VA 22314<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. #2:23-cv-248<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT

Preliminary Statement and Jurisdiction

1.  Christopher Lapp was a loving father and for many years a gainfully employed

nuclear physicist with security clearances from the Department of Energy and the Nuclear

Regulatory Commission.  He suffered an increasingly severe psychiatric decline culminating in a

psychotic state that led him, in 2018, to rob a bank and steal a car in Fairfax County, Virginia.

He was promptly arrested and never again a free man.  From November 2018 until May 18,

2021, he was incarcerated in several correctional facilities as his case, hampered by his continuing mental incapacity, proceeded through the criminal law system.

2.  In due course, while at the Federal Medical Center in Butner, North Carolina ("Butner"), Dr. Lapp finally agreed to be medicated for his mental health.  He regained a sufficient measure of competence for him to appear before the Hon. T. S. Ellis, III to enter a plea of guilty to charges brought against him.  On that occasion, Judge Ellis ordered the Marshals Service to return Dr. Lapp from the Alexandria Adult Detention Center ("ADC") to Butner for ongoing "continuity of treatment and mental health care" pending a hearing on sentencing. Judge Ellis ordered the clerk to send a copy of his order to this effect to the Marshals Service, to Butner, to Chief of Psychiatry Logan Graddy at Butner, and to all counsel of record, and the clerk presumably did as ordered.  This was on April 16, 2021.  At that point, the prosecutorial and penal law systems collapsed for Dr. Lapp.

3.  At the direction, on information and belief, of Butner Warden Thomas  Scarantino, and other, currently unidentified, Bureau of Prisons employees, including possibly Dr. Graddy, Butner, ignoring Judge Ellis' order, refused to accept Dr. Lapp.  The Marshals Service, ignoring Judge Ellis' order, did not transport Dr. Lapp back to Butner.  On information and belief, these defaults were immediately communicated to counsel for Butner, Genna Petre, and to the assistant United States attorneys in charge of the prosecution of Dr. Lapp, Maureen Cain and Morris Parker.  None of them did anything to cause Judge Ellis' order to be implemented or appropriately challenged.  Dr. Lapp thus remained incarcerated in the ADC, Judge Ellis' order notwithstanding.

4.  Dr. Lapp had brought to the ADC from Butner a "bridge" supply of the two psychotropic medications – Abilify and Remeron – that had permitted him to regain sufficient mental health stability.  There is uncertainty regarding what documentation of Dr. Lapp's mental health treatment and status were given to the by Butner to the Marshals Service when transporting Dr. Lapp, and whether all necessary documents were delivered to the ADC by the Marshals Service.

5.  At the ADC, Dr. Lapp was seen by defendant Dean Inouye, M.D., a psychiatrist.  Dr. Inouye did not have Dr. Lapp's mental health chart from Butner.  He neither requested it nor consulted with Butner's mental health staff in aid of providing Dr. Lapp with appropriate treatment.  In an astounding departure from elementary professional practice, on or about March 15, 2021, Dr. Inouye discontinued Dr. Lapp's psychotropic medications based solely on Dr. Lapp's assertion that he did not need them  – a predictable assertion given his documented, limited insight into his illness, his symptomatic grandiosity, and his ignorance of the range of consequences that could flow from his discontinuing his medications: all matters recognized by the various mental health professionals who had seen Dr. Lapp  – except Dr. Inouye.

6.  Over the ensuing weeks, Dr. Lapp proceeded visibly to decompensate at the ADC.  On May 18, 2021, he committed suicide by hanging himself with a sheet.

7.  As regards the actions of the federal employees identified herein by name or position – Dr. Graddy, Warden Scarantino, counsel for Butner Petre; other, currently unidentified Bureau of Prisons officials responsible for overriding Judge Ellis' order that Dr. Lapp be returned to Butner for continuity of care; currently unidentified employees of the Marshal Service, and federal prosecutors Cain and Parker – this action arises under the Federal Tort Claims Act, 28

U.S.C. §2679 ("FTCA"), in that their lawless overriding of Judge Ellis' order, taken within the scope of their respective employment, made possible the mental and physical deterioration of Dr. Lapp, and ultimately his demise, at the ADC.  The Court has jurisdiction over these claims under 28 U.S.C. §1346(b)(1).

8.  As regards Dr. Inouye's actions here at issue, which took place after Dr. Lapp pleaded guilty but before he was sentenced, this action arises under the Eighth or Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.[1]  The Court has jurisdiction over the §1983 claim pursuant to 28 U.S.C. §1331.  The Court has supplemental jurisdiction under 28 U.S.C. §1367 over the state law wrongful death claim against Dr. Inouye, which arises out of the same  operative facts as give rise to the federal claim against him, and thus forms part of the same case under Article III of the Constitution.

<u>Parties</u>

9.  Plaintiff Lisa Lapp is the duly appointed administrator of the estate of the late Christopher Lapp.

10.  Plaintiff J.L. is the 16-year old daughter of Christopher Lapp and Lisa Lapp.  She sues by her mother and next friend, Lisa Lapp.  Under Code of Va. §8.01-53(A), she is the sole statutory beneficiary of Christopher Lapp's wrongful death claims brought here.

---

[1]There is a split in the circuits as to the constitutional basis of a post-plea-pre-sentencing claim by an inmate, and no authority from the Fourth Circuit has been identified.  As a practical matter, this uncertainty does not impact the claim or the dispositive law.

11.   Defendant Unites States of America is the statutory defendant under the FTCA with regard to claims arising out of the torts committed by the federal employees named or identified by position herein, all of which torts were committed in their capacities as federal employees.

12.   Defendant Dean Inouye was, at all relevant times, an employee of the Alexandria Community Services Board, an entity that is not an arm of the Commonwealth nor a municipal corporation.[2]   Dr. Inouye worked, part time, as a psychiatrist providing mental health care to inmates of the ADC.   As such, he was acting under color of law in his actions relative to his treatment of Dr. Lapp.   In his work as psychiatrist, Dr. Inouye's relationship with his patients, including his inmate patients, was the "personal and confidential one of doctor and patient, not the Commonwealth of Virginia and patient," and his exercise of professional skills and judgment in treating his patients, and the means and methods used, were, "from the very nature of things, [] not subject to the control and direction of others."[3]   He is sued in his individual capacity for damages.

<u>Claim For Relief</u>

<u>Background of Christopher Lapp</u>

13.   Christopher Lapp was born in 1958 in Washington, D.C.   A brilliant student, he received a Ph.D. degree in nuclear science and engineering from the Massachusetts Institute of Technology, and thereafter worked as a nuclear physicist mostly in the private sector, holding security clearances from the Department of Energy and the Nuclear Regulatory Commission.

---

[2]*Fines v. Rappahannock Area Community Services Board*, 876 S.E. 2d. 917 (2022).

[3]*McCloskey v. Kane*, 604 S.E.2d 59, 61 (2004).  *See also, Lee v. Bourgeois*, 477 S.E. 2d 495 (1996), *James v. Jane,* 282 S.E. 2d 864 (1980).

14.   In 2002, Dr. Lapp married plaintiff Lisa Lapp, the mother and next friend of their daughter J.L., also plaintiff herein.   J.L. was born in 2006.

15.   Some years following the birth of J.L.,  Dr. Lapp began experiencing disconcerting mood changes.  Previously a jovial, happy man, always the life of the party, he would lapse into dark moods and speak of implausible conspiracies and other weird matters.  In due course he was diagnosed with severe bipolar I disorder with psychotic features and delusional disorder.

16.   In 2013, the Lapps divorced, Ms. Lapp being unable to continue coping with Dr. Lapp's occasional lapses into delusion and incoherence.   J.L. continued to live with her mother.

17.   The Lapps remained on cordial terms, principally with a view to maintaining J.L.'s relationship with her father, which J.L. and Dr. Lapp visibly cherished.  Until his death, Dr. Lapp remained a loving father.  Until his arrest in November 2018, he paid the agreed monthly payment for child support of $1800 without fail.

18.   In November 2018, Dr. Lapp, having suffered an acute psychotic break, entered a Wells Fargo Bank in Great Falls, Virginia, and at gunpoint took money from a teller. He then demanded car keys from a woman outside the bank and drove her car away.  The stolen car was found, a K-9 officer tracked Dr. Lapp to his home, and he was promptly arrested and jailed.  He remained incarcerated in different detention facilities until his death in May 2021.

Dr. Lapp's Incarceration and Mental Health Care

19.   At the Fairfax, Virginia Adult Detention Center where he was taken following his arrest, Dr. Lapp was seen by John Wilson, M.D., psychiatrist with the Fairfax-Falls Church Community Services Board ("CSB"), provider of mental health services to the Fairfax ADC.

Dr. Wilson noted on November 20, 2018 that Dr. Lapp was "calm, cooperative, denies risk issues.  Has serious mental issues but masks well. [R]efuses treatment."  Dr. Wilson also noted: "Copious paranoia and gradiosity, though fairly charming in presentation; could imagine p[atien]t evading mental health/legal system for prolonged periods of time based on preserved interpersonal skills.  No interest in treatment."  Before leaving the Fairfax ADC in or about January 14, 2019, Dr. Lapp was diagnosed as "paranoid schizophrenic . . .  not currently interested in medication management."

20.  From January 14, 2019 until being sent to a federal medical facility in October 2019 for assessment of mental capacity to stand trial, Dr. Lapp was for the most part incarcerated at the Alexandria ADC.

21.  In due course, Dr. Lapp's defense counsel arranged for him to be examined by Jonathan DeRight, Ph.D., a neuropsychologist, to assess Dr. Lapp's capacity to understand the nature and consequences of the criminal charges pending before him.  Dr. DeRight's report was submitted to the Court on June 17, 2019.  Dr. DeRight concluded that Dr. Lapp likely suffered from an organic brain disorder involving atrophy of the frontal lobe, giving rise to "significant executive dysfunction."   In finding a likely organic cause for Dr. Lapp's condition, Dr. DeRight did not have the benefit of MRI scans of Dr. Lapp's brain, taken later.

22.  After filing DeRight's report with the Court, defense counsel filed notice of Dr. Lapp's intent to plead a defense of insanity. He also filed a motion for a competency evaluation to determine Dr. Lapp's fitness to stand trial.

23.  On July 30, 2019, defendant Dr. Inouye saw Dr. Lapp at the ADC for the first time, for a mental health evaluation.  Dr. Inouye started Dr. Lapp on mirtazapine (Remeron), 30 mg for insomnia and unpleasant dreams.  On October 1, 2019, CSB staff noted that Dr. Lapp had "discontinued psychiatric services and is no longer prescribed psychotropic medications.  He reports no mental health needs at this time.  He will be closed to jail [mental health] services."

24.  Dr. Lapp's benign self-assessment and rejection of mental health medications notwithstanding, on September 23, 2019, Judge Ellis found, based on Dr. DeRight's assessment, that there was reasonable cause to believe Dr. Lapp was suffering from a mental disease or defect rendering him mentally incompetent to stand trial.  Judge Ellis ordered Dr. Lapp committed to the custody of the Bureau of Prisons at Butner for a psychiatric evaluation, with a report to be filed with the Court.  A copy of Judge Ellis' order was sent to the Marshals Service and to the Bureau of Prisons as well as counsel of record.[4]

25.  On or about December 19, 2019, Leticia Armstrong, a psychologist at the Fort Worth correctional institution, filed her report on Dr. Lapp with the Court.  Dr. Armstrong found "significant and consistent influence of delusional thinking related to [Dr. Lapp's] decision-making throughout the evaluation process."  She diagnosed him with bipolar I disorder, current episode manic, with psychotic features, and also alcohol use disorder by history. She found that Dr. Lapp "display[ed] significantly limited insight into his mental illness and need for psychiatric treatment," and that he "appeared to lack insight into the

---

[4]Judge Ellis' order notwithstanding, on October 10, 2019, Dr. Lapp was transferred not to Butner but to the federal correctional institution in Fort Worth, Texas, where he was evaluated from October 10 through December 8, 2019.

impact of his internal, irrational thought content on his ability to participate meaningfully in the courtroom proceedings and assist his counsel."

26. On January 29, 2020, based on Dr. Armstrong's report Judge Ellis found Dr. Lapp incompetent to stand trial. Judge Ellis ordered the Bureau of Prisons to determine whether he might be restored to competency. A copy of Judge Ellis' order was sent to the Bureau of Prisons and the Marshals Service as well as counsel of record.

27. Unbeknownst to Judge Ellis, Dr. Lapp had taken issue with Dr. Armstrong's report. On January 23 2020, he complained to a CSB licensed professional counselor at the ADC that Dr. Armstrong "wrote on the form that I was delusional and that I was paranoid." He insisted that someone was "after me from Russia." Presenting as "calm and cooperative and engaged," Dr. Lapp denied any mental health needs. On a subsequent occasion he told the counselor – incorrectly – that he had been court-ordered to receive involuntary medication so that "they can get the judge to say he is delusional."

28. On or about January 30, 2020, Dr. Lapp sent a hand-written letter to Judge Ellis contesting Dr. Armstrong's conclusion that he was delusional and incompetent to stand trial, advising that he would refuse medication intended to restore him to competence, and expressing the desire to "get to plea." As Dr. Lapp repeatedly stated in the grandiose fashion noted by most of his examiners, he believed he would be treated leniently by reason of his allegedly uniquely significant work for the United States government and his alleged unmasking of a Russian Mafia unit that had allegedly caused him to be arrested. (Judge Ellis attempted to disabuse him of this notion at a hearing on February 6, 2022.)

29.  Judge Ellis did not accept Dr. Lapp's benign self-assessment at face value.  On February 6, 2020, he convened a hearing to reconsider whether Dr. Lapp was competent to stand trial.  At the hearing, Dr. Armstrong testified in support of her findings and conclusions previously submitted.  Rejecting Dr. Lapp's benign self-assessment, Judge Ellis reaffirmed his findings and order of January 29, finding him incompetent to stand trial.  On February 10, 2020 he issued an order to that effect, copies of which were sent to the Marshals Service, the Bureau of Prisons, and counsel of record.

30.  On August 19, 2020, Butner Warden Scarantino filed with the Court the results of further psychological assessments of Dr. Lapp by a forensic psychologist and a neuropsychologist working at Butner. Observing that Dr. DeRight had not had the benefit of multiple neuroimaging scans of Dr. Lapp's brain that did not support an organic origin of Dr. Lapp's illness, the psychologists concurred with Dr. Armstrong that Dr. Lapp suffered from biopolar I disorder, current episode manic, with psychotic features.  They noted that Dr. Lapp had "limited insight into his condition," maintaining he was not mentally ill and refusing psychiatric intervention.  They assessed the probability of his being restored to competence in the foreseeable future to be low.  They did not support the forced administration of medication to restore him to competence for purposes of trial.

31.  In response to an order from Judge Ellis requiring more detailed information about Dr. Lapp's possible return to competence, on September 23, 2020 Warden Scarantino filed a supplementary report prepared by Logan Graddy, Chief Psychiatrist at Butner.  Responding to the Court's questions, Dr. Graddy opined:

* That Dr. Lapp should be treated voluntarily (and not involuntarily) for bipolar disorder and delusional disorder,

* That medication would likely be helpful in restoring Dr. Lapp to competence, although there existed the risk that decreasing his usual manic mood to a normal one would to him appear "depressing and slow,"

* That there existed known side effects to the proposed medication regimen,

* That clinical improvement would require "treatment with medication for the foreseeable future," although symptoms of bipolar disorder generally respond "fairly quickly to medications (weeks)."

32.  On December 17, 2020, Butner psychologists filed a supplemental report with the Court advising that Dr. Lapp had consented to receive psychotropic medication and had begun a regimen of aripiprazole (Abilify) 15 mg and mirtazapine (Remeron)15 mg. The report also noted that Dr. Lapp himself "has not recognized any changes since the initiation of his psychiatric medication regimen."

33.  By supplemental report filed February 16, 2021, Butner's forensic psychologist informed the Court of the following salient points:

* Dr. Lapp had been "100% medication violent complian[t],"

* Dr. Lapp's diagnosis was bipolar disorder, in partial remission,

* Dr. Lapp was no longer incompetent to stand trial,

* Dr. Lapp "does not believe he has a mental illness,"

* Dr. Lapp's prognosis was "fair."  The psychologist noted, however, that "should he discontinue treatment, his prognosis is poor."

-11-

34.   The forensic psychologist providing the February 16, 2021 assessment made a point of noting as follows:  "Although [Dr. Lapp] is presently medication compliant and psychologically stable, *it is imperative he be maintained on this regimen to prevent the likelihood of psychological decompensation as mental health symptoms may wax and wane*." (Emphasis added.)

35.   Together with the February 16, 2021 supplemental report, Warden Scarantino filed with the Court a certificate of Dr. Lapp's restoration of competence to stand trial.

36.   On or about February 26, 2021, the Marshals Service took custody of Dr. Lapp for transfer to the Alexandria ADC, where he would be held pending a hearing before Judge Ellis.

37.   The documentation provided by Butner, via the Marshals Service, on the occasion of Dr. Lapp's discharge from Butner contained no information regarding the history and course of Dr. Lapp's treatment at Butner.  It contained no information to the effect that Dr. Lapp was known glibly to deny or minimize his mental illness or need for medication. It contained no information to the effect that he had refused medication for months on end before agreeing to take it, following which he had been restored to competence.  It did not include any of the reports, referenced above, generated by Butner's mental health staff.

38.   As counsel for Butner thereafter confirmed to Judge Ellis, Butner had neither plans nor – Butner believed – obligation to see or treat him again.  Counsel told Judge Ellis: "We do not accept individuals for continuity of care purposes."  So far as the authorities at

Butner were concerned, Butner was discharging Dr. Lapp to the Alexandria ADC as having been successfully treated.

39.   The authorities at Butner knew they were discharging Dr. Lapp to a local jail rather than a mental health correctional facility where he had been under the watchful eye of a team of psychiatrists and psychologists who had persuaded him, over his longstanding opposition, to begin a course of medication and succeeded in maintaining him on it.  They knew that, having been restored to competence, Dr. Lapp continued to face involvement with the criminal law system, and as a result needed to remain competent, if for no other reason.  They were aware that he was at risk of decompensating were he not to remain on the medications that had restored him to competency, and noted that in his record.

40.   Following Dr. Lapp's death, counsel for Butner represented to Judge Ellis, by letter dated July 26, 2021, that prior to an individual's transfer from Butner to the custody of the Marshals Service, the individual is assessed by FMC Butner psychology staff and a summary is provided to the Marshals Service; in addition, a discharge summary is completed by the appropriate medical providers and uploaded into the individual's medical records. In addition, hard copy of this documentation is provided to the Marshals Service.

41.   Notwithstanding the known facts of Dr. Lapp's case, the documentation received by and signed for at the Alexandria ADC did not include information sufficient to apprise the Alexandria authorities of Dr. Lapp's history, course of treatment, and manifest need for continuing medication as determined at Butner.  The documentation merely noted his diagnosis, current medications, and advised merely that medications should be continued "until evaluated by physician unless otherwise indicated."  These forms, amounting to five

pages none of which bore the name, signature or approval of a medical doctor, a psychiatrist or a psychologist, were received and signed for by personnel from the Alexandria ADC on March 2, 2021.[5]

42.   Butner counsel's July 26, 2021 oral assurances to Judge Ellis about the provision of medical documentation "in every case" notwithstanding, by Response to Court Order filed August 9, 2021, counsel conceded that the Bureau of Prisons was "unable to determine" whether documentation other than the five pages noted in ¶41 were provided to the Marshals Service for transport.  As of this writing, whether additional documents, including an appropriate discharge summary, were not provided by Butner to the Marshals Service, or whether, having received same, the Marshals Service did not deliver it to the Alexandria ADC, remains to be determined.  What is known is that only the above-referenced five pages of transit information were signed for at the ADC.  Those forms listed the two medications that had been administered to Dr. Lapp at Butner to restore him to competence: aripiprazole (Abilify) and mirtazapine (Remeron), as "medications dispensed with prisoner for transport."

43.   Dr. Lapp's bridge medications provided by Butner  – Abilify and Remeron  – lasted for two weeks, through March 15, 2021.  He received none thereafter.

---

[5]In reaction to the provision of such documentation, and following Dr. Lapp's suicide, by order dated June 30, 2021 Judge Ellis ordered that "from this day forward, the Bureau of Prisons/FMC Butner SHALL provide, at a minimum, discharge summaries to medical treatment providers at ADC when inmates are transferred from FMC Butner to ADC."  (Emphasis in original.)

44.  At a hearing on March 5, 2021, based on Butner's certification of Dr. Lapp's restoration to competence and the report supporting same, Judge Ellis found Dr. Lapp competent to stand trial.

Defendant Dr. Inouye Consults With Dr. Lapp

45.  Following Dr. Lapp's readmission to the Alexandria ADC in March 2021, Dr. Inouye, the ADC psychiatrist, tried to see him for the first time on March 16.  He proved unable to do so, but two days later had his initial 2021 consultation with Dr. Lapp.  In his notes memorializing this consultation, Dr. Inouye incorrectly identified Dr. Lapp as a "new client."  In fact, Dr. Inouye had seen Dr. Lapp at the ADC in July 2019, when he prescribed Remeron for him.  This was memorialized on 2019 CSB records, as was the fact that Dr. Lapp was not compliant with his medications.  Remeron was one of the two medications prescribed for Dr. Lapp at Butner to return him to mental competence.

46.  Notwithstanding that progress notes memorializing Dr. Inouye's earlier consultation with Dr. Lapp existed, it is not certain that Dr. Inouye consulted them before seeing Dr. Lapp in March 2021, as he listed Dr. Lapp as a "new patient" at that time.  Apart from the five transfer pages from Butner naming Dr. Lapp's diagnosis and his medications and directing that the medications not be discontinued except following medical review, Dr. Inouye neither received nor solicited any information regarding Dr. Lapp or his history of care. He was aware that records existed memorializing Dr. Lapp's mental health treatment at

-15-

Butner, but claimed that these records "were not available for review."[6]

47.   Dr. Inouye did not conduct "a complete evaluation of Dr. Lapp." This was so, Dr. Inouye explained, "because Dr. Lapp did not want a full evaluation done." No refusal of a "complete examination" appears in Dr. Inouye's notes of his consultation.[7]

48.   On seeing Dr. Lapp in March 2021, Dr. Inouye noted in his sole progress note that Dr. Lapp had been "referred for continuity of medication therapy for a diagnosis of bipolar 1 disorder, current or most recent episode manic, in partial remission." He was also aware that Dr. Lapp's bridge medications had just run out.

49.   Dr. Also Inouye wrote in his 2021 progress note that "Butner psychiatric records [on Dr. Lapp] were not available [at the ADC] for review." But counsel for Butner later advised Judge Ellis that "providers at ADC, or any other detention facility, are always welcome to contact FMC Butner's providers regarding a patient previously in our care." Butner counsel noted that there was "no known attempt by ADC to contact FMC providers to inquire about Mr. Lapp's condition." Discovery is needed to resolve the dispute whether more records than the five pages of transit documents accompanying Dr. Lapp to the ADC were "not available" to Dr. Inouye, as he claimed.

---

[6]As there is disagreement regarding what documentation was or was not sent to the ADC by Butner, routinely or in the case of Dr. Lapp specifically, so too is there disagreement whether and on what basis additional records or information from Butner was available to Dr. Inouye were he to have asked. Discovery is required to contend with the contradictory representations made to Judge Ellis regarding these matters at a hearing following Dr. Lapp's death. *See,* ¶71, *infra* at 23.

[7]At a post-mortem hearing on June 25, 2021, counsel for the CSB initially told Judge Ellis, mistakenly, that Dr. Inouye had "conducted a full psychological evaluation, psychiatric evaluation of Mr. Lapp, including whether there was a need for medication." A the hearing, Dr. Inouye admitted having done no such thing.

50.  Finding that he had insufficient information regarding Dr. Lapp's mental health history – he later told Judge Ellis: "I did not know why he was diagnosed with bipolar I disorder" – Dr. Inouye "hoped that [Dr. Lapp] could fill me in on what had happened at Butner and how it was that he was diagnosed with bipolar I disorder."  But Dr. Lapp said "he did not know why he was diagnosed with bipolar I disorder," and could only relay that he had been so advised by the doctors at Butner, who "wanted me to take medicine.  I took the medicine because I was told to."  Dr. Lapp provided Dr. Inouye with no useful information about his medication regimen, which Dr. Inouye had been directed to maintain absent professionally mandated changes.

51.  Dr. Lapp presented well to Dr. Inouye, just as he had to many of his prior mental health-care providers.  But unlike Dr. DeRight or the various psychologists and psychiatrists at Butner, in a woeful departure from elementary professional standards and procedures, Dr. Inouye took what Dr.  Lapp said at face value, without further inquiry into the palpable inadequacy of Dr. Lapp's insight into his mental health, his circumstances, and his mental health needs.  Dr. Lapp's report to Dr. Inouye that he "ha[d] no knowledge" about having a bipolar mood diagnosis by itself undermined any reasonable conclusion that he was an accurate historian of his own case or a reliable source of information regarding his own needs.  Dr. Lapp's professed ignorance exemplified the earlier observations of psychologist Armstrong to the effect that Dr. Lapp "display[ed] significantly limited insight into his mental illness and need for psychiatric treatment," and that of psychiatrist Wilson that he "could imagine [Dr. Lapp's] evading mental health/legal system for prolonged periods of time based on preserved interpersonal skills.  No interest in treatment."

52. Dr. Lapp told Dr. Inouye that his lawyer had retained a psychiatrist who disagreed with "the government's diagnosis."[8] Dr. Lapp instructed that "he had read about bipolar I disorder while he was at Butner, and said that he didn't think he met criteria for biopolar I disorder." Recklessly accepting Dr. Lapp's benign self-assessment at face value, Dr. Inouye discontinued the medications Butner's professionals had specifically directed be continued, absent medical review.[9] He discontinued these medications – the ones that had returned Dr. Lapp to competence – in ignorance of his patient's actual status and needs, and without further investigation. In coming to this decision, he relied solely on the articulate and well-presenting but mentally ill Dr. Lapp, who, as was his want, said he was feeling "fairly well."

53. Dr. Inouye professed being "puzzled" as to why Dr. Lapp did not know why he had been diagnosed with bipolar I disorder. This alleged puzzlement prompted Judge Ellis to say: "I take it you know that people who were bipolar and had manic phases often say, after it's over, 'I didn't have anything.'" Dr. Inouye allowed that this "was a possibility," and also that persons have amnesia after a psychotic episode.

54. The fact that mentally ill persons often do not perceive or admit their illness is commonly known among laypersons, to say nothing of professionals dealing with mental illness. Thus, Dr. Lapp's prosecutor – a lawyer, not a doctor – observed at a status conference on January 24, 2020: ""[W]hile Mr. Lapp may be saying to his attorney no, I'm

---

[8]This presumably referred to the organic brain disease diagnosis proposed by Dr. DeRight (a psychologist, not a psychiatrist) in the absence of supportive MRI findings.

[9]Butner's transport directive to this effect did not expressly require "competent professional medical review"; it assumed it.

perfectly fine, it is very common for people who might have this condition to think they're perfectly fine. But in an abundance of caution, to create a clean record in this case, I believe he needs to obtain this medication that [Dr. Armstrong] is recommending and/or undergo further evaluation."

55.  Dr. Inouye conceded that his "only source of information . . . was Dr. Lapp himself, and I wasn't sure where to go with that."   Unsure or not, where Dr. Inouye "went with that" was to terminate Dr. Lapp's psychotropic medications that had restored him to trial competence.  In a gross departure from elementary principles of assessment, diagnosis and treatment of mental health problems, he did this on the basis of no more than the glib representations of a well-presenting, intelligent, articulate man diagnosed as suffering from bipolar I disorder, a disease with known cyclical features.  Supportive information may have been a phone call away[10], but Dr. Inouye solicited nothing and received nothing shedding light on Dr. Lapp's condition and needs.  By not soliciting basic information he knew he both needed and lacked, Dr. Inouye recklessly blinded himself to the fact that, as Dr. Lapp's treating psychologist had noted less than one month earlier, it was "imperative" that Dr. Lapp be maintained on his medication regimen so as to prevent the "likelihood" of his psychological decompensation, since "mental health symptoms may wax and wane."

---

[10]This is uncertain and apparently in dispute.  Following Dr. Lapp's death, counsel for Butner advised Judge Ellis that additional information on discharged patients was available for the asking.  But Dr. Inouye told the judge that no additional records were "available for review." *See* fns. 13 & 14 at 23-24, *infra.*

56.  Relying on his conceded ignorance of his patient's circumstances and needs, Dr. Inouye informed Dr. Lapp on March 18, 2021 that he was not going to resume his psychotropic medications.  He did this notwithstanding his awareness, subsequently confirmed to Judge Ellis in a post-mortem hearing, that it would have been appropriate for Dr. Lapp to "continue the successful [medication] regime that he had been under."

57.  Unsurprisingly, Dr. Lapp concurred with the decision to discontinue his medications.

58.  Dr. Inouye's decision to terminate Dr. Lapp's psychotropic medications and Dr. Lapp's response were memorialized in Dr. Inouye's progress note written on the day of his sole consultation with Dr. Lapp.[11]  Dr. Lapp never again received the medications that had restored him to trial competence.

59.  On his March 2021 ADC healthcare intake screening Dr. Lapp had been noted as having a "history of mental health illness" and designated for "mental health chronic care."  As a result of Dr. Inouye's assessment, however, he was no longer seen for mental health issues by anyone from the CSB.  Following Dr. Inouye's termination of Dr. Lapp's medication, Dr. Lapp was terminated as a mental health patient for which the CSB was responsible under its contract with the ADC.

---

[11]Dr. Inouye's progress note impeaches his testimony before Judge Ellis on June 25, 2021 to the effect that "I did not tell Dr. Lapp that I did not think he needed to take the medication," and that it was Dr. Lapp, rather, who told him that he, Lapp, did not want to take Abilify.  Dr. Inouye's progress note dating from his consultation with Dr. Lapp reads: "I counseled him that I was not going to resume his previous aripiprazole dose due to a lack of current, clinical indication or supporting documentation from Butner, and he concurred."

60.  Well-established risk factors for potential suicide include (a) severe mental health issues, including bipolar I disease and psychosis, and (b) the incarceration of successful, high-achieving persons for whom incarceration represents an enormous and frightening collapse of status and dignity.  The healthcare screening form used for Dr. Lapp's 2021 admission to the ADC lists "prominent member of the community" as a "suicide risk" category.[12]  These risk factors, matters of common knowledge within the correctional mental health community in particular, dictate appropriate precautionary measures to safeguard the well-being of the inmates at issue. On information and belief, in another woeful default of professional responsibility, Dr. Inouye did not take any steps to address foreseeable decompensation Dr. Lapp might exhibit at the ADC now that his medications had been discontinued.

Judge Ellis Takes Dr. Lapp's Plea and Orders Him Returned to Butner

61.  On April 16, 2021, Dr. Lapp appeared in court before Judge Ellis in order to plead guilty to the charges remaining against him.  On this occasion, Judge Ellis questioned Dr. Lapp about his mental health.  Dr. Lapp explained that he was no longer taking the medication he had been taking at Butner, because "I was not prescribed by the psychiatrist presiding in this facility in Alexandria."

62.  Judge Ellis asked if the doctor at Butner knew that Dr. Lapp was no longer taking the medicine he had prescribed.  Dr. Lapp said he did not know, and his counsel said that his repeated calls to Butner had not been answered.  Judge Ellis observed to Dr. Lapp: "it is

---

[12]As he always did when asked, Dr. Lapp denied any suicidal ideation.

difficult to know how much that doctor [Inouye] knew about your history," and that "if you need the continued care of Dr. Graddy [at Butner], I want to be sure that you get it."

63.  At the April 16 hearing, Dr. Lapp pleaded guilty to three of the four counts against him, following which Judge Ellis explained that a pre-sentence report would be prepared and Dr. Lapp returned to court for sentencing.

64.  At the April 16 hearing, Dr. Lapp's counsel advised Judge Ellis that Dr. Lapp had not been returned to Butner after the March 5 hearing because personnel at Butner "didn't understand they were required to bring him back or had been ordered to."   In response, Judge Ellis said he would issue an order directing the Marshals Service to return Dr. Lapp to Butner, observing "I want him cared for medically thoroughly."  Government counsel Cain confirmed that the government had no objection to such an order.

65.  On April 16, 2021, Judge Ellis entered an order setting Dr. Lapp's sentencing six months later.  Concluding that Dr. Lapp had to remain under medical supervision in order to maintain his competence and assist his counsel properly through the time of sentencing, and given Dr. Graddy's protracted effort and singular success in restoring a recalcitrant Dr. Lapp to competence with voluntarily medication, pursuant to 18 U.S.C. §4241(e) Judge Ellis' ordered as follows: "To ensure continuity of treatment and mental health care for the defendant, and with the agreement of the parties, the United States Marshals Service is **DIRECTED** promptly to return defendant to Butner so defendant may remain under the care of Dr. Graddy."   (Emphasis in original.) The order was sent to the Marshals Service, which retained custody of Dr. Lapp pending sentencing, to Butner, to Dr. Graddy at Butner, and to all counsel of record.

66.  Judge Ellis' order notwithstanding, the government did not return Dr. Lapp to Butner.  He remained at the Alexandria ADC, deprived of the medications that had rendered him mentally competent for trial.

### Dr. Lapp Remains at the ADC Without His Medications and Hangs Himself

67.  On April 23, 2021, counsel for Dr. Lapp filed a notice with the Court to the effect that Dr. Lapp had not been returned to Butner as ordered.  Counsel provided the telephone number of Butner Senior Attorney Petre for further information.  The motion was served on counsel for the government.  On information and belief, no government attorney took any steps to secure compliance with (or seek to modify) Judge Ellis' order.

68.  Dr. Lapp remained at the ADC, unmedicated, gradually decompensating, and without ongoing mental health supervision.  His mental deterioration reflects the manifestation of suicide not as a discrete act, but as an ongoing disease leading eventually to the dispositive act of killing oneself.  As Donald Antrim has written in *One Friday in April: A Story of Suicide and Survival* (2021), depictions of suicide as impulsive acts or rational responses obscure "the hours, months and years of anxiety and physical deterioration, the fear and the seeming resignation with which we go to our deaths."  The mental anguish attendant on this ongoing condition of misery is, in the end, sufficiently overpowering to cause self-inflicted death.

69.  On May 18, 2021, Dr. Lapp hanged himself with a sheet in his cell.  He was taken to the hospital, where he died.

70.  Having written to his daughter J.L. about twice a month during his incarceration,

Dr. Lapp left the following note for her:

> *To J_____.*
>
> *I am very sorry, J., but some bad people have been after me for a while.*
>
> *I have been trying to determine who they are but things are not good.*
>
> *It is better for everyone if I am not around so they can't harm others.*
>
> *You will hear things but know this[:] I always tried to do good things for you but there is only a limited amount I can do now.*
>
> *I have decided that what I have left goes to you for school later in life.  So don't worry, J.  Life is not always fair.  But you will do well.   I know this is tough for you and I feel bad, but I have run out of things/ideas to make the situation better.*
>
> *I have other letters for what to do with things.  I love you, J.  Celebrate my life!*
>
> > *Chris*

71.  On being apprised of Dr. Lapp's death by his counsel, by order entered June 3,

2021, Judge Ellis directed the government to show cause "why defendant was not accepted

for treatment as directed by the April 16, 2021 order, given that the defendant had been

receiving treatment at FCI Butner that had restored defendant to competency . . ."

72.  At the show cause hearing on June 25, 2021:

*    Counsel for Butner advised: "We do not accept individuals for continuity of

     care purposes."

*    Counsel for the CSB stated: "There hasn't been a patient transferred from

     Butner in 10 years where any records have come, not even a discharge

     summary."  Dr. Inouye agreed that he had "never received a discharge

summary."[13]

*       Dr. Inouye told Judge Ellis that he had reviewed "the medical record," but this uncabined characterization resolved itself, by his own description, into the five pages of transit documents accompanying Dr. Lapp to the ADC stating his diagnosis ("bipolar I disorder, current") and identifying his two psychotropic medications with direction that they be continued pending medical review.

*       Dr. Inouye conceded that he "did not know why [Dr. Lapp] was diagnosed with bipolar I disorder; that his "only source of information at that point was Dr. Lapp himself"; that Dr. Lapp told him that he, Lapp, "had read about bipolar I disorder while he was at Butner and . . . didn't think he met criteria for bipolar I disorder" and that "persons with bipolar disorder sometimes say, after a manic episode, 'I don't have anything,'" and also may have amnesia about the episode.

*       Dr. Inouye conceded that the appropriate thing to have been done was for Dr. Lapp to have "continued the successful [medication] regime he had been

---

[13]Contesting Dr. Inouye's characterization, by letter to Judge Ellis dated July 26, 2021, counsel for Butner wrote that in accordance with the procedure followed "in every competency study case at Butner without exception [,] . . as part of FMC Butner's transfer of custody of Mr. Lapp to the Marshals Service, a hard-copy file containing a medical summary and other pertinent documents was hand-delivered to the Marshals Service simultaneously with physical custody of Mr. Lapp."  On August 9, 2021, the government filed in court what it described as the medical and mental health information on Dr. Lapp delivered to (and signed for at) the ADC when Dr. Lapp was admitted.  Discovery is needed to clarify the tension between what the various parties contend about Butner's provision of documentation to the ADC.

under" – *i.e.*, the regimen Dr. Inouye had discontinued without adequate grounds.

73.     At the June 25, 2021 hearing, Judge Ellis said:

*       "Dr. Lapp's medical records are substantial, and the reason I sent him to Butner was so that people who knew all about him would take care of him and keep him competent."

*       "[T]here's a history of Dr. Lapp at Butner, and treatment there, and it had been very successful.  And that was the purpose of my returning him there, and no lawyer and no doctor should have countermanded that order without my participation."

*       "[A]ny decision by Butner not to accept [Dr. Lapp] is a violation of my order. . . .  That order is there and it must be obeyed until I vacate it or change it."

*       [To counsel for Butner:] "I wasn't asking you, I was ordering. . . . I don't care what your procedures say about who you accept and who you don't.  I don't care what your lawyers tell you about what the law permits and doesn't permit.  If I issue an order, you must obey it until I vacate it or change it.  Have I made that unmistakenly clear to you?"

*       "I don't think the ADC did anything wrong here.  I think the problem is the physician.  I'm sure ADC said: 'What do we do about Dr. Lapp?'  And they asked the physician."

*       [To counsel for the CSB:] "[Dr. Inouye] didn't have the records.  I am confident that if he knew the full history, he would know more than he knew,

and it seems to me that whatever medication he was on was something that

had brought him back to competency and it ought to have been continued.

That's why I sent him back to Butner."

\*      "[Dr. Inouye] was told by Dr. Lapp that he didn't want any more of that

medicine, and that he didn't exhibit any of the signs of potential suicide at the

time, and so he didn't prescribe any more medication for him.  Well, we don't

know if that was a mistake.  I believe it was.  I don't think that all of the

information was known."

74.   The employees of the United States named above, and others not named,

knowingly and willfully defied Judge Ellis' unappealed or otherwise challenged court order

directing that Dr. Lapp be returned to Butner for continuity of care under Dr. Graddy.  In so

doing, these employees acted negligently or otherwise wrongfully, in that it was manifestly

incumbent on them, given the law of the United States, North Carolina and Virginia, to

effectuate said order unless it was reconsidered or otherwise appropriately challenged.  The

employees here at issue include, on information and belief, Warden Scarantino, Butner

Counsel Petre, and any other employees of Butner or the Bureau of Prisons, currently

unidentified, involved in the decision to disregard Judge Ellis' order requiring Dr. Lapp's

return to Butner for continuity of care.[14]  The employees also include the personnel from the

Marshals Service, currently unidentified, who likewise ignored Judge Ellis' order directing

the Marshals Service to return Dr. Lapp to Butner.  The employees likewise include

_____

[14]Whether Dr. Graddy participated in the decision not to readmit Dr. Lapp is unknown.
The Bureau of Prisons repeatedly failed to respond to counsel's request for Butner's records on
Dr. Lapp pursuant to the Freedom of Information Act.  This will be learned in discovery

prosecuting counsel Cain and Parker, who, being aware over a period of weeks that Judge

Ellis' order was being ignored, took no steps to secure its implementation or modification.

But for these employees' negligence or otherwise wrongful acts, Dr. Lapp would not have

remained, deteriorated, and died at the ADC.

75.   The actions of Dr. Inouye in terminating Dr. Lapp's psychotropic medications

that had restored him to competence reflected an appalling failure to adhere to the most

elementary principles of assessment, diagnosis and treatment of persons with mental illness.

His willful but ignorant termination of the medications manifested deliberate indifference to

a known, palpable risk of mental deterioration by a patient with a documented history of

severe mental illness, regardless of the patient's glib dismissals thereof, with suicide an

ever-present possibility to be avoided by available means. Dr. Inouye's actions at issue

include:

* recklessly relying on the glib and benign self-assessment and self-diagnosis of

an intelligent and articulate patient with a known history of bipolar I disorder,

where it was commonplace, practitioners were taught, and all of Dr. Lapp's

prior providers had found, that such patients, including specifically Dr. Lapp,

were unreliable historians or diagnosticians, and that their opinions or views

could not be relied on as a basis on which to assess their condition or base

diagnosis and treatment, or otherwise serve as substitutes for available and

informed professional assessments, and

* recklessly ignoring an existing diagnosis and withdrawing duly prescribed

medication from a patient without having properly evaluated the patient and

his needs and without having secured necessary and readily available

information from competent professional sources regarding the  patient's

history, condition, diagnosis, and treatment.

Exhaustion of FTCA Remedies

76.  On September 10, 2021, the undersigned counsel for plaintiffs filed claims under

the Federal Tort Claims Act, 28 U.S.C. §2671 *et seq*. with the Bureau of Prisons, Butner, the

Marshals Service, and the Department of Justice, covering the federal employees and claims

against the United States here at issue.  The only substantive follow up was from the

Marshals Service, which by letter dated September 21, 2021, requested additional

documentation regarding the claim, which was promptly provided.  By letter dated

December 6, 2021, a representative of the Federal Tort Claims Act Staff from the

Department of Justice advised the undersigned that for purposes of plaintiff's various FTCA

claims, that office would be the lead agency pursuant to 28 C.F.R. §14.2(b).  No further

communication has been received in response to any of the claims, and this lawsuit now

follows.

Causes of Action

Against the United States of America

Count I: FTCA Survival Claim For Violation of Court Order

77.  But for the federal actors' grossly negligent and willful violation of Judge Ellis'

unchallenged order to return Dr. Lapp to Butner for ongoing care at the hands of mental

-29-

health professionals who knew him and had successfully treated him, so as to ensure his continued competence through sentencing, as set forth above, Dr. Lapp would not have suffered the withdrawal of his medications at the Alexandria ADC by Dr. Inouye, and suffered severe mental and emotional anguish, pain and suffering from the time when his medications were discontinued until the moment when he hanged himself. Given Dr. Lapp's substantial improvement under the care he had received at Butner, it is reasonably foreseeable that had he returned to Butner, he would have been properly cared for and not suffered the anguish leading him to take his life. The claim for damages for Dr. Lapp's pain and suffering prior to his death survives his death pursuant to CODE OF VA. §8.01-25. Under the FTCA, the claim is properly presented by plaintiff Lisa Lapp, the administrator of Dr. Lapp's estate, against the United States.

### Count II: FTCA Claim for Wrongful Death

78.   But for the federal actors' grossly negligent and willful violation of Judge Ellis' unchallenged order to return Dr. Lapp to Butner for ongoing care at the hands of mental health professionals who knew him and had successfully treated him, so as to ensure his continued competence through sentencing, as set forth above, Dr. Lapp would not have remained at the Alexandria ADC to be deprived of his psychotropic medications by Dr. Inouye. Given his substantial improvement under the care he had received at Butner, it is reasonably foreseeable that had he returned to Butner, he would have been properly cared for and not ended up committing suicide. Pursuant to the FTCA, the United States is thus liable for the damages resulting from Dr. Lapp's wrongful death under CODE OF VA. §8.01-

50 *et seq.*  The sole beneficiary under this claim, pursuant to §8.01-53(A), is plaintiff J.L.,

Dr. Lapp's sole child.

## Against Dr. Inouye

### Count III: Eighth or Fourteenth Amendment Survival Claim For Pain And Suffering[15]

73.   Dr. Inouye's reckless withdrawal of Dr. Lapp's psychotropic medications as set

forth above manifested his deliberate indifference to the foreseeable severe adverse

consequences of said withdrawal, under circumstances where Dr. Inouye knew – as he

subsequently conceded to Judge Ellis – that Dr. Lapp should have been maintained on his

medications.  As a result of Dr. Inouye's withdrawal of his medications, Dr. Lapp suffered

severe mental and emotional anguish, pain and suffering until the moment when he hanged

himself.  The claim for Dr. Lapp's resulting damages under the Eighth or Fourteenth

Amendments to the United States Constitution and 42 U.S.C. §1983 survives Dr. Lapp's

death pursuant to Code of Va. §8.01-25, and is properly presented by plaintiff Lisa Lapp, the

administrator of his estate against Dr. Inouye.

### Count IV: Wrongful Death: Dr. Inouye

79.   But for Dr. Inouye's reckless and grossly negligent withdrawal of Dr. Lapp's

psychotropic medications as set forth above, it is reasonably foreseeable that Dr. Lapp

would have remained mentally stable and not committed suicide.  Dr. Inouye is thus liable

for the damages resulting from Dr. Lapp's wrongful death under Code of Va. §8.01-50 *et*

---

[15] *See* n.1 at 4, *supra.*

*seq.* The sole beneficiary under this claim, pursuant to §8.01-53(A), is plaintiff J.L., Dr.

Lapp's sole child.

<u>Protective FTCA Claims</u>[16]

<u>Count V: Failure to Provide Records Resulting in Pain and Suffering</u>

77.  By negligently failing, as set forth above, to provide the authorities at the

Alexandria ADC with sufficient medical records and information regarding Dr. Lapp's

history and course of treatment, leading Dr. Inouye to terminate the medications that had

returned Dr. Lapp to competence, the federal authorities proximately caused Dr. Lapp to

undergo pain and suffering at the ADC up to the moment of his death.   Those responsible

were either at Butner or with the Marshals Service or both: a matter that will require

discovery to determine.  The claim for damages for Dr. Lapp's pain and suffering prior to his

death survives his death pursuant to Code of Va. §8.01-25. Under the FTCA, the claim is

properly presented by plaintiff Lisa Lapp, the administrator of Dr. Lapp's estate, against the

United States.

---

[16]Counts V and VI are proffered, on a protective basis in an abundance of caution, solely
in the event of two developments in this case, both over plaintiff's objection: (1) the Court finds
that Dr. Inouye did the best he could with the limited information he had and could get from
Butner, and for that reason bears no liability for Dr. Lapp's decompensation, pain and suffering,
and death, or (2) the Court permits the jury to consider such a defense by Dr. Inouye.  If neither
eventuality comes to pass, these two counts will be voluntarily dismissed.

Count VI: Protective FTCA Claim: Failure to Provide Records, Resulting in Death

80.  By negligently failing, as set forth above, to provide the authorities at the Alexandria ADC with sufficient medical records and information regarding Dr. Lapp's history and course of treatment, leading Dr. Inouye to terminate the medications that had returned Dr. Lapp to competence, the federal authorities proximately caused Dr. Lapp to undergo decompensation to the point of his suicide.  Those responsible were either at Butner or with the Marshals Service or both: a matter that will require discovery to determine. Pursuant to the FCTA, the United States is thus liable for the damages resulting from Dr. Lapp's wrongful death under Code of Va. §8.01-50 *et seq.*  The sole beneficiary under this claim, pursuant to §8.01-53(A), is plaintiff J.L., Dr. Lapp's sole child.

\*\*\*

Wherefore, plaintiffs ask this Court for an order:

* Granting plaintiff Lisa Lapp actual damages against the United States for the pain and suffering of Christopher Lapp from the withdrawal of his psychotropic medications leading to his death, in an amount appropriate to the proof at trial;

* Granting plaintiff Lisa Lapp actual damages and punitive damages against defendant Inouye for the pain and suffering of Christopher Lapp from the withdrawal of his psychotropic medications leading to his death, in amounts appropriate to the proof at trial;

*        Granting plaintiff J.L. damages against the United States and defendant

Inouye for the wrongful death of Christopher Lapp, in accordance with the

provisions of Code of Va. §8.01-52.

*        Awarding plaintiff's costs and reasonable attorney's fees; and

*        Granting plaintiff such other relief as is just.

Plaintiffs request trial by jury on their claims under Virginia law and 42 U.S.C.

§1983. and at the discretion of the court, an advisory jury on their FTCA claims.

Respectfully submitted,

LISA LAPP,

By counsel

Dated:  February 23, 2023

Counsel for Plaintiffs:


//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
LappLisa\Drafts\2023-0223-FinalComplaint



//s// Nickera S. Rodriguez
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
nsr@robinhoodesq.com