IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LISA LAPP, AS ADMINISTRATOR OF THE
ESTATE OF CHRISTOPHER LAPP,

    Plaintiff,

v.                           Case No. 1:23-cv-248-MSN-LRV

THE UNITED STATES OF AMERICA AND
DEAN INOUYE,

    Defendants.

## DEFENDANT DEAN INOUYE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

      Defendant Dean Inouye, M.D. ("Dr. Inouye"), by counsel, submits this Memorandum in Support of his Motion for Summary Judgment.

## BACKGROUND

      Plaintiff Lisa Lapp, as Administrator of the Estate of Christopher Lapp ("Plaintiff"), asserts a civil rights claim and a state law medical malpractice claim against Dr. Inouye, a licensed psychiatrist.  Amended Compl., Dkt. 5.  Plaintiff alleges that as a result of inadequate medical care rendered by Dr. Inouye at the Alexandria Detention Center on March 18, 2021[1], Plaintiff's decedent, Christopher Lapp, committed suicide on May 18, 2021.  *See id.* at ¶ 5-6.

      Plaintiff asserts two counts against Dr. Inouye: 1) an "Eighth or Fourteenth Amendment Survival Claim for Pain and Suffering" as a result of Dr. Inouye's alleged "deliberate indifference"; and 2) wrongful death due to Dr. Inouye's "reckless and grossly negligent

---

[1] The Amended Complaint alleges that Dr. Inouye discontinued Dr. Lapp's psychotropic medications on March 15, 2021.  However, the Complaint later alleges that the only time that Dr. Inouye saw Dr. Lapp in the relevant timeframe was on March 18, 2021.  *See id.* at ¶ 56.

withdrawal of Dr. Lapp's psychotropic medications." *See id.* at ¶ 73[2] and 79.  Plaintiff seeks "actual damages and punitive damages against defendant Inouye for the pain and suffering of Christopher Lapp from the withdrawal of his psychotropic medications leading to his death" and "damages…for the wrongful death of Christopher Lapp in accordance with provisions of Code of Va. § 8.01-52."[3]

The parties have completed discovery and have designated their respective expert witnesses.  Dr. Inouye now moves for summary judgment as to all claims against him.

## I.  Plaintiff's Allegations

Plaintiff alleges that in November 2018, Dr. Christopher Lapp suffered an "acute psychotic break, entered a Wells Fargo bank…and at gunpoint took money from a teller" and then stole a car to flee the scene of the robbery. Dkt. 5 at ¶ 18.

Dr. Lapp was seen by a psychiatrist from the Fairfax-Falls Church Community Services Board in November 2018, and Dr. Lapp refused treatment.  Dkt. 5 at ¶ 19.

Judge Ellis ordered that Dr. Lapp undergo a psychiatric evaluation at Federal Medical Center Butner ("Butner").  *Id.* at ¶ 24.  Plaintiff alleges that psychologist Dr. Leticia Armstrong diagnosed Dr. Lapp with bipolar I disorder.  Plaintiff asserts that Dr. Logan Graddy, the Chief Psychiatrist at Butner provided a supplemental report stating that Dr. Lapp should be treated "voluntarily (and not involuntarily) for bipolar disorder and delusional disorder."  *Id.* at ¶ 31.  On December 17, 2020, a supplemental report filed with this Court noted that Dr. Lapp had consented to receive the medications aripiprazole 15mg and mirtazapine 15mg. *Id.* at ¶ 32.

---

[2] Confusingly, the Amended Complaint has two paragraphs that are labelled paragraph 73.  The first appears on page 26 of the Amended Complaint and contains factual allegations.  The second paragraph 73 appears on page 31 of the Amended Complaint and is the paragraph cited as a count against Dr. Inouye.

[3] While Plaintiff does not specify an amount of damages sought, Plaintiff's recovery under the state law claim is limited to $2.45 million pursuant to Va. Code § 8.01-581.15.  Furthermore, any punitive damages claim is capped at $350,000 pursuant to Va. Code § 8.01-38.1.

Dr. Lapp was transferred to the Alexandria Adult Detention Center (the "Alexandria ADC") on March 2, 2021. *Id.* at ¶ 41. Judge Ellis found Dr. Lapp competent to stand trial on March 5, 2021. *Id.* at ¶ 44. Dr. Lapp was transferred to the Alexandria ADC with a "bridge order" for his two medications, which Plaintiff alleges lasted through March 15, 2021. *Id.* at ¶ 43.

Dr. Inouye saw Dr. Lapp on March 18, 2021, and Dr. Inouye did not conduct a full psychological evaluation of Dr. Lapp because Dr. Lapp refused such an evaluation. *Id.* at ¶ 47. Plaintiff alleges that Dr. Inouye discontinued the two medications, and Dr. Lapp "concurred with the decision to discontinue his medication." *Id.* at ¶ 55-57.

On April 16, 2021, Dr. Lapp appeared before Judge Ellis to plead guilty to the charges that remained against him. *Id.* at ¶ 61. Judge Ellis questioned Dr. Lapp on his mental health, and Dr. Lapp informed Judge Ellis that he was not taking the medication prescribed at Butner, because he had not been prescribed medication by Dr. Inouye. *Id.* at ¶ 61. Judge Ellis, aware of the fact that Dr. Lapp had not been taking any psychiatric medication, accepted Dr. Lapp's guilty plea and ordered Dr. Lapp to return to court for sentencing. *Id.* at ¶ 63. Judge Ellis ordered that Dr. Lapp be returned to Butner to "ensure continuity of treatment and mental health care." *Id.* at ¶ 65.

Plaintiff's Complaint alleges that the U.S Marshals Service failed to transport Dr. Lapp to Butner. *Id.* at ¶ 66. Plaintiff alleges that as a result of Dr. Inouye failing to prescribe the two medications and as a result of the failure of the United States to comply with Judge Ellis' April 16, 2021 order, Dr. Lapp committed suicide on May 18, 2021. *Id.* at ¶ 69.

## II. Expert Witnesses

### a. Plaintiff's Experts Against Dr. Inouye

#### i. Erik Christensen, M.D.

Plaintiff has designated Erik Christensen, M.D., a licensed forensic pathologist and medical examiner, to testify as to the "physiologic processes, as well as the expected associated pain and suffering that would accompany a death resulting from a self-inflicted hanging."   A true and correct copy of Dr. Christensen's report and CV is attached hereto as **Exhibit A.**

Dr. Christensen does not offer any standard of care opinions regarding Dr. Inouye's care and treatment of Dr. Lapp.  *See* Ex. A.  Dr. Christensen does not offer any opinions that any of Dr. Inouye's actions caused Dr. Lapp's death.

#### ii. Michael Hendricks, Ph.D., ABPP

Plaintiff has designated Michael Hendricks, Ph.D., ABPP, a licensed <u>psychologist</u>, not a psychiatrist, to testify as to the standard of care applicable to Dr. Inouye.   A true and correct copy of Dr. Hendricks' report and CV is attached hereto as **Exhibit B.**

Dr.  Hendricks' opinions are summarized in his report as follows:

> Dr. Inouye's termination of mental health care, including prescribed medications, to Dr. Lapp without sufficiently understanding his history, course of treatment, and the reasons for which the medications had been prescribed; his failure to request and receive treatment records or information from FMC Butner regarding Dr. Lapp; his decision to disregard an agreed and supported diagnosis of Bipolar I Disorder and instead allow Dr. Lapp to render his own, painfully inadequate, mental health diagnosis, failing to take into consideration that the preference of many individuals diagnosed with Bipolar Disorder to stop taking their medications is medically contraindicated; and his failure to continue to take into consideration relevant known suicide risk factors, manifested Dr. Inouye's reckless disregard for elementary professional protocols defining the standard of care that governed his work at issue. In my opinion, this disregard was a significant causal factor in causing Dr. Lapp to decompensate to the point of dying by suicide.

Ex. B at p. 20.

**b. Dr. Inouye's Experts**

**i. Barbara Ziv, M.D.**

Dr. Inouye has designated Barbara Ziv, M.D. to offer testimony on the standard of care applicable to Dr. Inouye; causation opinion testimony; and to rebut the opinions of Plaintiff's experts. A true and correct copy of Dr. Ziv's report and CV are attached hereto as **Exhibit C.**

Dr. Ziv will testify that Dr. Inouye's evaluation of Dr. Lapp and clinical decision-making was within the standard of care. Ex. C. at p. 31. She will further opine that Dr. Inouye had sufficient information upon which to make psychiatric decisions regarding Dr. Lapp. *Id.* She will testify that there is no objective information to suggest that Dr. Lapp's psychiatric state changed as a result of discontinuing Abilify and Remeron, and she will testify that there is no objective information to suggest that the suicide was related to the discontinuation of those medications. *Id.* Dr. Ziv will rebut the testimony of Dr. Hendricks and Dr. Clark.

**ii. Michael R. Arambula, M.D., Pharm.D.**

Dr. Inouye has designated psychiatrist Michael R. Arambula, M.D., Pharm.D., to offer standard of care and causation opinion testimony and to rebut the opinions of Plaintiff's experts. A true and correct copy of Dr. Arambula's report and CV are attached hereto as **Exhibit D.**

Dr. Arambula will testify that Dr. Inouye conducted an appropriate psychiatric evaluation of Dr. Lapp's mental condition and suicide risk on March 18, 2021. Ex. D. at p. 1. He will further testify that there are no records showing that Dr. Lapp ever exhibited an imminent risk of physical harm to himself or to others. *Id.* He will testify that Dr. Inouye could not ethically or legally have disregarded Dr. Lapp's right to refuse treatment and administer any mental health treatment interventions against his will. *Id.* Dr. Arambula will testify that it would not have

been possible for Dr. Inouye to have prevented Dr. Lapp's sudden, unforeseen act of self-harm two months after Dr. Inouye evaluated him.  *Id.*

### c.  The United States' Expert – Dr. Michael Clark

The United States has filed no claim against Dr. Inouye, nor has Dr. Inouye filed any claim against the United States.  Despite this, the United States has designated Michael R. Clark, M.D., MPH, MBA, FAPM, to testify against Dr. Inouye.  True and correct copies of Dr. Clark's June 12, 2023 report and CV are attached hereto as **Exhibit E.**

In his report, Dr. Clark opines that Dr. Inouye "was negligent in his care and treatment of Mr. [*sic*] Lapp upon his return to the Alexandria ADC in March 2021.  Ex. E at 4.  He states that Dr. Inouye "independently decided that Mr. [*sic*] Lapp did not have a major mental illness, did not require active treatment with antipsychotic medications, and presumed Mr. [*sic*] Lapp was competent to request discontinuation of his medication[.]."  *Id.* at 5.

Plaintiff has improperly attempted to "adopt" Dr. Clark as her own expert in this matter. *See* Pltf.'s Supp. Discl. Of Expert Witness., attached hereto as **Exhibit F.**  According to Plaintiff's June 12, 2023 Supplemental Disclosure of Expert Witness, Plaintiff improperly seeks to adopt Dr. Clark's testimony regarding standard of care for Dr. Inouye, but explicitly does not adopt Dr. Clark's causation opinions.  *See* Ex. F, n.1.  Dr. Clark testified in his deposition that he has never met counsel for the Plaintiff and never communicated with counsel for the Plaintiff prior to his deposition.  *See* **Exhibit J**, Michael Clark, MD Depo Tr. at 25:15-22; 26:1-5.  Dr. Clark was not retained by Plaintiff nor was he paid any money by Plaintiff's counsel.  *See id.* at 26:6-12.  Nor had Dr. Clark met Lisa Lapp prior to his deposition.  *Id.* at 26:13-15.

## STATEMENT OF UNDISPUTED FACTS

**Lisa Lapp Relinquished Her Right to Serve As the Administrator of the Estate of Christopher Lapp**

1.      On July 11, 2023, Dr. Inouye served his First Requests for Admission on Plaintiff Lisa Lapp. Plaintiff failed to timely respond to Dr. Inouye's First Requests for Admission. A true and correct copy of the uncontested Requests for Admission is attached hereto as **Exhibit G**.

2.      Lisa Lapp and Christopher Lapp were divorced on December 3, 2013 pursuant to the Decree of Divorce A Vinculo Matrimonii issued by the Circuit Court of Alexandria in Case No. CL13004240.  *See* Ex. G at no. 4.

3.      Lisa Lapp entered into a Separation, Custody and Property Settlement Agreement on August 2, 2013. *See* Ex. G at no. 5.

4.      **Exhibit H** attached hereto is a true and correct copy of the Separation, Custody and Property Settlement Agreement between Lisa Lapp and Christopher Lapp. *See* Ex. G at no. 6.

5.      Lisa Lapp signed the Separation, Custody and Property Settlement Agreement. *See* Ex. G at no. 7.

6.      The Separation, Custody and Property Settlement Agreement provides, "Each party hereby relinquishes any and all rights that he/she may hereafter acquire to act as executor or administrator of the estate of the other party.  It is the intention of the parties that their respective estates shall be administered and distributed in all respects as though no marriage has been solemnized between them."  Ex. H, at Section 3 "Relinquishment of Right to Act As Executor."

**Treatment Provided by Dr. Inouye**

7.      Dr. Inouye does not create the schedule of which inmates he sees on any given day at the Alexandria ADC.  *See* **Exhibit K,** Dean Inouye, M.D., Depo Tr. 95:9-22; 96:1-4.

8.      Dr. Inouye attempted to see Dr. Lapp on March 16, 2021 but was unable to do so. *Id.* at 118:10-22; 119:1-4.

9.      Dr. Inouye saw Dr. Lapp at the Alexandria ADC on March 18, 2021.  *See Id.* at 27:12-14.

10.      Prior to seeing Dr. Lapp on March 18, 2021, Dr. Inouye reviewed past medical records for Dr. Lapp, going back to 2019, that were available to him.  *See Id.* at 99:18-22; 100:1-4.

11.      The records Dr. Inouye reviewed included Dr. Lapp's Community Services Board records, the CorEMR records, and the FMC Butner prisoner transport form. *Id.* at 111:1-8; 187:13-19.

12.      Dr. Inouye estimates that he spent thirty to forty minutes speaking with Dr. Lapp on March 18, 2021.  *Id.* at 130:5-8.

13.      At the March 18, 2021 appointment, Dr. Inouye had a discussion with Dr. Lapp, the purpose of which was to see if Dr. Lapp was going to continue medication that he had been taking when he arrived at the Alexandria ADC.  *Id.* at 29:21-22; 30:1-4.

14.      Dr. Lapp did not agree to speak with Dr. Inouye on March 18, 2021, but Dr. Inouye began a discussion with Dr. Lapp to attempt to elicit consent for evaluation.  *Id.* at 31:1-20.

15.      Dr. Lapp told Dr. Inouye that he did not want to take aripiprazole or other medications because he did not believe that he had bipolar I disorder.  *Id.* at 165:3-11.

16.     Dr. Lapp told Dr. Inouye that he had never had a manic episode; that he disagreed with the diagnosis of bipolar I disorder; and that he had read a book about bipolar I disorder on the hospital ward. *Id.* at 165:13-22; 166:1-5.

17.     Dr. Inouye asked Dr. Lapp about whether he was experiencing any symptoms of depression by listing each symptom of depression individually.   Dr. Lapp denied these symptoms. *Id.* at 166:17-21.

18.     Dr. Inouye asked Dr. Lapp questions about anxiety.  *Id.* at 167:8.

19.     Dr. Inouye asked Dr. Lapp about his sleep.  *Id.* at 167:8-9.

20.     Dr. Inouye asked Dr. Lapp about how he was handling the COVID-19 lockdowns at the Alexandria ADC.  *Id.* at 167:9-10.

21.     Dr. Inouye showed Dr. Lapp the medication administration record for the two medications.  *Id.* at 329:19-22.

22.     Dr. Inouye asked Dr. Lapp if he was having any side effects due to the medication bridge order expiring.  *Id.* at 330:1-7.

23.     Dr. Inouye told Dr. Lapp that he could resume the Abilify (aripiprazole).  *Id.* at 330:7-8.

24.     Dr. Lapp told Dr. Inouye that he did not want to take the Abilify.  *Id.* at 331:3-5.

25.     Dr. Inouye asked if the reason that Dr. Lapp did not want to continue taking medication was due to side effects, and advised that there were other medications he could take. *Id.* at 331:6-8.

26.     Dr. Lapp told Dr. Inouye that the reason that he did not want to take medication was that he (Dr. Lapp) disagreed with his diagnosis and did not agree that he had a diagnosis of bipolar I disorder.  *Id.* at 331:6-12.

27.     Dr. Inouye attempted to speak with Lauren Broderick of the Alexandria ADC mental health team regarding whether Dr. Lapp had signed a release in order to obtain copies of the medical records from FMC Butner.  *Id.* at 139:7-22; 140:1.

28.     Dr. Inouye was not a party to Judge Ellis' April 16, 2021 Order.  Ex. G at no. 3.

**A Patient's Right to Refuse Medication**

29.     Dr. Lapp was not under an order to be involuntarily medicated while housed at the Alexandria ADC.  *See* Ex. G at no. 1.

30.     Dr. Lapp was not under an order to be involuntarily medicated while housed at the FMC Butner.  *Id.* at no. 2.

31.     Plaintiff's expert Dr. Hendricks acknowledged that if Dr. Lapp was prescribed medication and he did not want to take the medication, he had the right to refuse to take the medication.  *See* **Exhibit L,** Michael Hendricks Depo. Tr. at 160:14-18.

32.     United States of America expert Dr. Clark concedes that Dr. Inouye "may have been prohibited from submitting orders for psychiatric medications without Mr. Lapp signing an informed consent document."  Ex. E at p. 3.

33.     Dr. Clark further concedes that in a non-emergent setting, a patient has the right to refuse treatment. *See* Exhibit J, at 64:6-11.

34.     Dr. Clark admits that it was Dr. Lapp's choice whether to take medication on March 18, 2021 and thereafter.  *See id.* at 65:12-13; 15-16; 18-20; 22; 66:1-2.

**Events Following Dr. Inouye's March 18, 2021 Encounter with Dr. Lapp**

35.     Plaintiff has produced no evidence showing that Dr. Lapp exhibited any behavioral disturbances or behavioral issues while in custody at the Alexandria ADC between March 18, 2021 and May 18, 2021.  The absence of evidence of behavioral issues is undisputed.

36.     At no point after March 18, 2021 did criminal defense counsel for Dr. Lapp move to challenge the Court's competency finding.  **See Exhibit I,** Pltf's. Resp. to Def. United States of America's Second Req. for Admission, no. 60.

37.     Plaintiff's expert psychologist Dr. Hendricks concedes that he personally conducted an "independent assessment of [Dr. Lapp's] competency to stand trial, his competency to plea [.]" in March 2021.  *See* Ex. L at 87:1-8; 23-25; 88:1.

38.     Plaintiff's expert psychologist, Dr. Michael Hendricks, concedes that as of March 26, 2021, he believed, based on his evaluation of Dr. Lapp, that Dr. Lapp was competent.  *See id.* at 88:16-17.

39.     When Dr. Hendricks saw Dr. Lapp on March 24, 2021, Dr. Lapp was cooperative and euthymic.  *Id.* at 97:10, 98:10.

40.     Dr. Hendricks was aware when he saw Dr. Lapp on March 24, 2021 that Dr. Lapp had stopped taking his medications.  *Id.* at 102:4-6.

41.     Dr. Hendricks did not believe that Dr. Lapp presented an imminent threat to himself or others as of March 26, 2021.  *Id.* at 109:6-9.

42.     On April 16, 2021, in a hearing before the United States District Court for the Eastern District of Virginia, Alexandria Division, Dr. Lapp pled guilty to one count of armed bank robbery, one count of carjacking, and one count of using and carrying a firearm during and in relation to a crime of violence.  Ex. I at nos. 65-67.

43.     At the April 16, 2021 plea hearing, Judge Ellis found that Dr. Lapp was "fully competent" to plead guilty to each count.  *Id. at* nos. 68, 70, 72.

44.     Judge Ellis was aware that Dr. Lapp was not taking any drugs or medication for his "bipolar condition."  *Id*. at no. 72.

45.     On April 16, 2021, Judge Ellis signed an Order directing the United Sates Marshals Service to "promptly return defendant to FCI Butner so defendant may remain under the care of Dr. Graddy." *Id*. at no. 82.

46.     On April 16, 2021, Judge Ellis advised Dr. Lapp that one of the three charges to which he pled guilty (using and carrying a firearm during a crime of violence) carried a mandatory minimum term of imprisonment of seven years.   Judge Ellis further advised that the seven year mandatory minimum sentence must run consecutive to any sentences imposed on the other counts. *Id*. at nos. 96, 98.

47.     Dr. Lapp passed away on May 18, 2021, which was sixty-seven days after the bridge supply of Abilify and Remeron ended and thirty-two days after his guilty plea hearing of April 16, 2021. *Id*. at nos. 76-78.

**The Role of a Psychologist Versus a Psychiatrist**

48.     Dr. Hendricks, Plaintiff's expert psychologist, concedes that a psychiatrist is a "medical doctor" with either an M.D. or D.O. degree, and a psychiatrist is trained in medicine, including "how to do medication prescription management and so on."   Dr. Hendricks further concedes that a psychiatrist is trained in diagnosis, with a focus on the physical or sematic or medical aspect of mental illness. *See* Ex. L at 27:2; 13-17.

49.     Dr. Hendricks further admits that a psychologist, in contrast, "gets either a Ph.D. or a Psy.D.…and is trained in…how to do interviewing, how to do…psychotherapy and also how to do psychological assessment." *Id.* at 27:18-23.

50.     Dr. Hendricks states that "with psychiatry the focus is more on the medication and medication management…[and] with psychology it's the…there is the assessment piece that psychiatrists don't have." *Id.* at 28:13-16.

51.     Dr. Hendricks does not have a medical degree.  *Id.* at 35:4-6.

52.     Dr. Hendricks, as a licensed psychologist, cannot prescribe medication.  *Id.* at 29:14.

## GOVERNING LAW

### I.     Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is considered material "if it might affect the outcome of the suit under the governing law." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact through citations to the record, in accordance with Rule56(c)(1).  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by showing an absence of evidence to support the opposing party's case. *Id.* at 325.

Once the moving party meets its burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The opposing party may not rely on mere allegations in his pleadings to defeat summary judgment. *Id.* at 324.  Nor may the opposing party rely on irrelevant or unnecessary factual disputes or the "mere argued existence" of a genuine factual dispute. *Anderson*, 477 U.S. at 248.  Further, if the evidence presented by the opposing party is merely colorable, and not significantly probative, summary judgment is appropriate. *Id.* at 249-50.  In sum, a motion for summary judgment should be granted when the

evidence is so one-sided in light of the governing law that the moving party must prevail as a matter of law. *Id.* at 252.

Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023).

## II.     Medical Negligence and Expert Requirement

To prevail on a claim for medical negligence under Virginia law, the plaintiff must establish the applicable standard of care, that the defendant breached the standard of care, and that such breach was a proximate cause of the injury claimed. *See, e.g., Dixon v. Sublett*, 295 Va. 60, 67, 809 S.E.2d 617, 620 (Va. 2018) (citing *Brown v. Koulizakis*, 229 Va. 524, 532, 331 S.E.2d 440, 446 (Va. 1985)); *accord Ricks v. Huynh*, Civil Action No. 2:20cv292, 2021 WL 2014795, *8 (E.D. Va. May 20, 2021) (citations omitted).

Expert testimony is required to satisfy each of these elements, except in the rare instances in which the defendant's negligence falls within the common knowledge of lay jurors. *Dixon*, 295 Va. at 67-69, 809 S.E.2d at 620-21; *Raines v. Lutz*, 231 Va. 110, 113, n.2, 341 S.E.2d 194, 196 (1986).

Section 8.01-581.20 of the Virginia Code governs the qualification of a witness as an expert on the standard of care. *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690-91 (4th Cir. 2011); *Jackson v. Qureshi*, 277 Va. 114, 121, 671 S.E.2d 163, 167 (Va. 2009). Compliance with this statute requires at minimum, that the witness "have expert knowledge on the standard of care in the defendant's specialty and an 'active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.'" *Lloyd v. Kime*, 275 Va. 98, 109, 654 S.E.2d 563, 569 (Va. 2008) (quoting Va. Code § 8.01-581.20); *accord Creekmore*, 662 F.3d at 691 (citation omitted). These two

14

requirements are commonly referred to as the "knowledge requirement" and the "active clinical practice requirement." *Creekmore*, 662 F.3d at 691 (citing *Hinkley v. Koehler*, 269 Va. 82, 88, 606 S.E.2d 803, 806 (Va. 2005)).

Only a medical doctor may provide expert opinion on causation. *John v. Im*, 263 Va. 315, 321, 559 S.E.2d 694, 697 (2002) (citing *Combs v. Norfolk & W. Ry. Co.*, 256 Va. 490, 496, 507 S.E.2d 355, 358 (1998)).

### III.    Gross Negligence

Under Virginia law, gross negligence is a heightened degree of negligence "showing indifference to another and an utter disregard of prudence that amount to a complete neglect of the safety of such other person." *Elliot v. Carter*, 292 Va. 618, 622, 791 S.E.2d 730, 732 (Va. 2016) (quoting *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487, 603 S.E.2d 916, 918 (Va. 2004)). Gross negligence requires "a degree of negligence that would shock fair minded persons." *Id.* (quoting *Cowan*, 268 Va. at 487, 603 S.E.2d at 918).

Further, "[b]ecause 'the standard for gross negligence in Virginia is one of indifference, not inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.* (alteration adopted) (quoting *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008)); *see also Fijalkowski v. Wheeler*, 801 F. App'x 906, 914 (4th Cir. 2020); *see also Whitley v. Commonwealth*, 260 Va. 482, 490, 538 S.E.2d 296, 300 (Va. 2000) (defendant physician exercised "some care" sufficient to defeat a claim for gross negligence by "reviewing [the patient's] blood samples, counseling him regarding the importance of taking his medication, and assessing his capability of following a daily medication regimen").

## IV.    Willful and Wanton Negligence

A showing of willful and wanton negligence requires "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 494, 706 S.E.2d 864, 871 (Va. 2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545, 514 S.E.2d 615, 618 (Va. 1999)).  The requirement that separates willful and wanton negligence from both ordinary and gross negligence is the defendant's "actual or constructive consciousness that injury will result from the act done or omitted." *Alfonso*, 257 Va. at 545, 514 S.E.2d at 618 (citing *Infant C. v. Boy Scouts of Am., Inc.*, 239 Va. 572, 580-81, 391 S.E.2d 322, 327 (1999)). This standard "nearly mirrors the subjective prong of the [deliberate indifference] test[.]" *Boley v. Armor Corr. Health Servs., Inc.*, No. 2:21CV197 (RCY), 2022 WL 905219, at *12 (E.D. Va. Mar. 28, 2022) (internal citation omitted).

## V.    Deliberate Indifference Under the Fourteenth Amendment[4]

A Fourteenth Amendment claim for inadequate medical care requires proof of deliberate indifference to a serious medical need. *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (internal citations omitted).  It "requires a showing that the defendants actually knew of and disregarded a

---

[4] Plaintiff asserts a claim under the "Eighth or Fourteenth Amendment" and asserts in her Complaint that there is no authority from the Fourth Circuit to guide which Amendment controls here.  However, as discussed further below, there is such guidance, and Plaintiff's Eighth Amendment claim is not proper.

substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." *Id*. (internal citations omitted). The claim "implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice." *White ex rel. White v. Chambliss,* 112 F.3d 731, 737 (4th Cir.1997).

### VI.    Punitive Damages

Punitive damages are available in Section 1983 actions for "conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (*quoting Smith v. Wade*, 461 U.S. 30, 56 (1983)). Though, "[t]he callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability." *Id.*

To recover punitive damages on a personal injury claim under Virginia law, the plaintiff must establish willful and wanton negligence. *Riddick v. Watson*, 503 F. Supp. 3d 399, 425 (E.D. Va. 2020) (*citing Huffman v. Love*, 245 Va. 311, 314, 427 S.E.2d 357, 359 (1993); Va. Code § 8.01-52). Virginia law strongly disfavors the imposition of punitive damages, which "should be awarded only in cases of the most egregious conduct." *Owens-Corning Fiberglas Corp. v. Watson,* 243 Va. 128, 144, 413 S.E.2d 630, 639 (1992) (*quoting Philip Morris Inc. v. Emerson*, 235 Va. 380, 407, 368 S.E.2d 268 (1988))

### ANALYSIS

Under the above facts and governing law, Dr. Inouye is entitled to summary judgment on all claims against him.

## I.      Plaintiff is Not A Proper Party

As noted above, it is undisputed that Lisa Lapp relinquished her rights to *ever* serve as an administrator or executor for the estate of Dr. Lapp as part of her divorce settlement agreement. Accordingly, Plaintiff Lisa Lapp as the administrator of the Estate of Christopher Lapp is not a proper party, and Dr. Inouye is therefore entitled to summary judgment of all claims brought against him by this improper party.

Under Virginia law, a person is obligated to read contracts that they enter into.  *See, e.g., Ashby v. Dumouchelle*, 185 Va. 724, 733, 40 S.E.2d 493, 497 (1946) "[M]arital property settlements ... are contracts[.]"  *Pysell v. Keck*, 263 Va. 457, 460, 559 S.E.2d 677, 678 (2002). Waiver is the voluntary and intentional abandonment of a known legal right, advantage, or privilege. *Weidman v. Babcock*, 241 Va. 40, 45, 400 S.E.2d 164, 167 (1991); *Fox v. Deese*, 234 Va. 412, 425, 362 S.E.2d 699, 707 (1987).

Here, Plaintiff Lisa Lapp intentionally and voluntarily waived her right to ever serve as administrator of the estate of Christopher Lapp when she signed the Separation, Custody, and Property Settlement Agreement (the "Agreement") pursuant to her divorce from Christopher Lapp.  The Agreement provides, "Each party hereby relinquishes any and all rights that he/she may hereafter acquire to act as executor or administrator of the estate of the other party."  Ex. H at Section 3 "Relinquishment of Right to Act As Executor."  Ms. Lapp was under a duty to read the Agreement under Virginia law.  Ms. Lapp does not contest that she voluntarily signed the Agreement. Accordingly, Ms. Lapp as the purported Administrator of the Estate of Christopher Lapp is simply not a proper party, as she has waived the right to serve in that capacity.  Dr. Inouye requests summary judgment on all claims against him brought by Ms. Lapp in her purported capacity as administrator.

## II.      Plaintiff's Eighth Amendment Claim is Not Proper Because the Decedent Was a Pretrial Detainee at the Time of the Events at Issue

Plaintiff asserts that her cause of action against Dr. Inouye "arises under the Eighth or Fourteenth Amendments to the United States Constitution[.]" Dkt. 5 at ¶ 8.  Plaintiff notes in a footnote that she can identify no authority for which Amendment serves as the proper basis for her claim.  *Id.* at fn. 1.  However, Plaintiff is incorrect, and pursuant to the Fourth Circuit's guidance in *Mays v. Sprinkle* 992 F.3d 295, 300 (4th Cir. 2021), Plaintiff's Eighth Amendment claim is improper.

The Fourth Circuit has held that the Eighth Amendment applies to claims made by convicted prisoners, while the Fourteenth Amendment applies to claims by pretrial detainees. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) ("Mays alleged that the denial of medical care violated both the Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause.  But since Mays was a 'pretrial detainee and not a convicted prisoner,' the Fourteenth Amendment, and not the Eighth Amendment, governs his claim.").  A person is "convicted" at the time that the person enters a guilty plea.  *United States v. Heyward*, 42 F.4th 460, 471 (4th Cir. 2022) ("'A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction[.]'") (*citing Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)).

It is undisputed that the conduct at issue by Dr. Inouye – his appointment with Dr. Lapp – occurred on March 18, 2021.  It is undisputed that Dr. Lapp entered his guilty plea, and was therefore convicted, on April 16, 2021.  Accordingly, at the time of Dr. Inouye's alleged deliberate indifference, Dr. Lapp was a pretrial detainee and not a convicted prisoner.  Therefore, only the Fourteenth Amendment applies to Plaintiff's claims.  Dr. Inouye therefore requests summary judgment as to Plaintiff's Eighth Amendment claim against him.

III.     **Plaintiff's Fourteenth Amendment Claim Fails as a Matter of Law Because Dr. Inouye Did Not Act with Deliberate Indifference**

The evidence in this case does not support a conclusion that Dr. Inouye acted with deliberate indifference to a serious medical need of Dr. Lapp.

Deliberate indifference requires a showing that the defendant actually knew of and disregarded a substantial risk of serious injury to the detainee or that the defendant actually knew of and ignored a detainee's serious need for medical care. *See White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir.1997) ("A claim of deliberate indifference ... implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice."); *see also Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  It is a "very high standard." *Young v. City of Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001) (*quoting Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir.1999)).

There is simply no evidence in this case that Dr. Inouye disregarded a known, substantial risk of serious injury to Dr. Lapp or ignored his serious need for medical care.

Dr. Inouye reviewed the medical records for Dr. Lapp at his disposal, going back to 2019. Dr. Inouye spent thirty to forty minutes with Dr. Lapp on March 18, 2021.  He asked Dr. Lapp questions regarding his medical history, including whether Dr. Lapp had a history of manic episodes, symptoms of depression, or symptoms of anxiety.  Dr. Inouye asked Dr. Lapp about his sleep and how Dr. Lapp was handling the COVID-19 lockdown at the Alexandria ADC.  He showed Dr. Lapp the medication administration record for the two psychotropic medications and asked Dr. Lapp if he had been experiencing any side effects due to the medication bridge order expiring.  He told Dr. Lapp that he could resume the Abilify.  When Dr. Lapp said that he did not want to take the medication, Dr. Inouye explored the reasoning behind this position, including asking Dr. Lapp whether he had been experiencing side effects when taking the medication.  Dr.

Inouye also advised Dr. Lapp that there were alternative medications he could take.  Even after the appointment, Dr. Inouye attempted to speak with Lauren Broderick, a member of the ADC mental health team, regarding whether Dr. Lapp had signed a release in order to obtain copies of the medical records from FMC Butner.

The inescapable fact of this case is, as Plaintiff's expert Michael Hendricks agrees, a patient has a right to refuse medical treatment, including psychiatric evaluation and prescription medication.  It is undisputed that Dr. Lapp did not want to take the medications that had been prescribed at Butner.  It is not deliberate indifference for a medical doctor to adhere to the consent given, or not given, by a patient.  Dr. Lapp did not consent to a full evaluation, so Dr. Inouye did not perform one.  Instead, he discussed the patient's history with him, discussed his medication with him, and discussed his current symptoms with him.  Dr. Lapp did not want to resume medication, and there was no emergent scenario on March 18, 2021, that would have justified Dr. Inouye forcibly medicating Dr. Lapp.

It is also significant that there is no evidence in this case that Dr. Lapp ever exhibited any behavioral disturbances that would have indicated to Dr. Inouye or others that Dr. Lapp had a substantial risk of serious injury to himself or others.  Indeed, Plaintiff's own expert Dr. Hendricks saw Dr. Lapp after Dr. Inouye, and Dr. Hendricks found Dr. Lapp to be cooperative and behaviorally undisturbed.

 Because Plaintiff cannot meet the very high standard of showing that Dr. Inouye acted with deliberate indifference to Dr. Lapp, Dr. Inouye requests summary judgment as to Plaintiff's Fourteenth Amendment claim against him.

**IV.    Plaintiff's Gross Negligence Claim Against Dr. Inouye Fails as a Matter of Law**

In Count IV: Wrongful Death: Dr. Inouye of her Amended Complaint, Plaintiff states, "But for Dr. Inouye's reckless and grossly negligent withdrawal of Dr. Lapp's psychotropic medications….it is reasonably foreseeable that Dr. Lapp would have remained mentally stable and not committed suicide."  Dkt. 5 at ¶ 79.  To the extent that this Count attempts to plead a gross negligence claim against Dr. Inouye, such a claim fails as a matter of law.

As noted above, "[b]ecause 'the standard for gross negligence in Virginia is one of indifference, not inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliot v. Carter*, 292 Va. 618, 622, 791 S.E.2d 730, 732 (Va. 2016).  In *Whitley v. Commonwealth*, a defendant physician exercised some degree of care sufficient to defeat a claim for gross negligence where the physician reviewed blood samples, counseled the patient, and assessed the patient's capability of following a medication regiment.  260 Va. 482, 490, 538 S.E.2d 296, 300 (Va. 2000).

Here, Dr. Inouye exercised much more than the minimal "some degree of care" required to defeat a gross negligence claim.  As detailed above, Dr. Inouye spoke with Dr. Lapp for thirty to forty minutes, reviewed his past medical records, discussed his medication with him, and discussed his medical history and symptoms with him.  Indeed, he covered the full range of what Dr. Lapp would consent to – an interview regarding his medical history, his current presentation, and his decision not to resume medication.  It is undisputed that Dr. Lapp did not consent to a full psychiatric evaluation by Dr. Inouye on March 18, 2021.

Because Dr. Inouye exercised "some degree of care" in his treatment of Dr. Lapp, any claim for gross negligence, to the extent that one is pled, must fail as a matter of law.

**V.      Plaintiff's State Law Medical Malpractice Claim Fails as a Matter of Law**

Plaintiff's state law medical malpractice claim asserts that Dr. Inouye's treatment of Dr. Lapp resulted in Dr. Lapp's death by suicide.  Plaintiff's claim fails as a matter of law, because Plaintiff has no qualified expert testimony on standard of care or causation as required under Virginia law.

**a.      Plaintiff's Expert Psychologist Michael Hendricks, Ph.D., Is Not Qualified to Offer Standard of Care Testimony Against Dr. Inouye**

Plaintiff's lone retained standard of care expert, Michael Hendricks, Ph.D., cannot offer standard of care opinion against Dr. Inouye as he does not meet the knowledge or active clinical practice requirement for a standard of care expert.  Plaintiff's case is without any qualified standard of care expert, and Plaintiff therefore cannot establish the elements of a medical malpractice claim under Virginia law.

i.   <u>Michael Hendricks Fails to Meet the Knowledge Requirement</u>

Michael Hendricks, Ph.D., is Plaintiff's sole retained expert as to standard of care in this matter.  He is a licensed psychologist.  As such, he is not qualified to testify as to the standard of care applicable to a licensed *psychiatrist*, a medical doctor.

"Any health care provider who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of practice in which he is qualified and certified." Virginia Code § 8.01–581.20(A).  Dr. Hendricks is not qualified or certified in psychiatry.  This is of particular importance in this case, as a psychologist is *not* legally permitted to prescribe medication.  The essence of Plaintiff's malpractice claim is that Dr. Inouye failed to prescribe medication to Dr. Lapp.  This is something that Michael Hendricks, as a psychologist, simply cannot do, and he can have no knowledge of the standard of care applicable to a prescriber.  In his deposition, Dr. Hendricks attempted to escape this glaring issue

by stating that he would write prescriptions and have an authorized prescriber essentially sign off on those prescriptions. *See* Ex. L at 33:16-25; 34:1-21. This is not comparable to a medical doctor assessing a patient and making a determination that it is appropriate to prescribe medication and to dose that medication.  In Dr. Hendricks' scenario, it is ultimately still the responsibility and obligation of the prescriber to determine if the medication is appropriate for the patient and to determine the appropriate dosing.  And in fact, Dr. Hendricks testified that psychiatrists reviewing his recommendations for medication have at times departed from Dr. Hendricks' recommendations, underscoring that it is ultimately the *doctor's* responsibility and role to determine what medication is appropriate and to prescribe it, because of a doctor's unique training in medical school and post-medical school training to do so.  *See* Ex. L at 67:2-7.

Because Michael Hendricks, Ph.D, does not have knowledge in the specialty of psychiatry, and particularly germane to this case, knowledge regarding prescribing medication, he is not qualified to testify as to standard of care against Dr. Inouye.

ii.   Michael Hendricks Fails to Meet the Active Clinical Practice Requirement

In order to satisfy the second prong stated in Code § 8.01–581.20(A) to qualify as an expert in a medical malpractice case, an expert must have "had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of that action."  In assessing whether an expert has practiced in a "related field of medicine," "it is sufficient if in the expert witness' clinical practice the expert performs the procedure at issue and the standard of care for performing the procedure is the same." *Sami v. Varn*, 260 Va. 280, 285, 535 S.E.2d 172, 175 (2000) (finding the active clinical practice of an outpatient OB/GYN sufficiently similar to that of an emergency room physician regarding the relevant procedure of a pelvic exam).

Here, Michael Hendricks is not legally able to perform the critical acts at issue – determining whether to prescribe a medication and prescription management – so he certainly has not "perform[ed] the procedure at issue" as part of his practice.  Dr. Hendricks draws the distinction between psychiatry and psychology himself.  He testified that a psychiatrist is trained in medicine, including "how to do medication prescription management and so on."  Dr. Hendricks also testified that a psychiatrist is trained in diagnosis, with a focus on the physical or sematic or medical aspect of mental illness.  *See* Ex. L at 27:2; 13-17.  In contrast, a psychologist does not have education and training as a medical doctor and does not have education or training in "medication prescription management and so on."  Accordingly, Dr. Hendricks does not have an active clinical practice in the medical field of psychiatry, nor does he practice in a "related field" as defined by the Supreme Court of Virginia.  Because Dr. Hendricks does not meet the active clinical practice requirement, he cannot testify as to standard of care against Dr. Inouye.

### iii. Plaintiff Cannot Rely on the United States' Retained Expert to Offer Standard of Care Testimony in Her Case in Chief

Plaintiff has attempted to "adopt" the United States' retained expert, Dr. Michael Clark, as her own standard of care expert in this matter.  However, Plaintiff may not use this expert in her case in chief to remedy her own lack of a retained, qualified standard of care expert.

Expert testimony is admissible if the expert's scientific, technical, or specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue.  Fed. Rule Civ. Proc. Rule 702.  In this case, there are no facts at issue between the United States and Dr. Inouye, because there is no claim made by the United States against Dr. Inouye (or vice versa).  What is at issue – and what Dr. Clark squarely addresses, is whether any breach of the standard of care by Dr. Inouye was an *intervening* cause of Dr. Lapp's suicide.  Dr. Clark opines

on the standard of care of Dr. Inouye in order to address the question of whether or not Dr. Inouye was an intervening cause that would relieve the United States of liability.

Plaintiff's attempt to use Dr. Clark as her own expert is improper. First, Plaintiff's counsel has had no contact with Dr. Clark outside of Dr. Clark's deposition. Plaintiff did not retain Dr. Clark as an expert. Dr. Clark is not a treating expert; he is solely a retained expert retained by the United States. Indeed, Plaintiff did not even identify Dr. Clark as a witness who Plaintiff expects to call in her case in chief. Dkt. 60 at p. 1-2. Instead, Dr. Clark is listed as a witness who Plaintiff may call. *Id.*

Second, to allow Plaintiff to use Dr. Clark as her expert would be particularly prejudicial in this matter. Not only would this cause the jury to view the Plaintiff and United States as collaboratively attacking Dr. Inouye, but in this matter, the United States does not present its case to the jury for a binding determination. In effect, Plaintiff will be borrowing testimony from an expert who otherwise would not be educating a jury that decides the outcome of the case in order to create her case in chief. The factfinder in the case as to the United States is the Court. The jury is only advisory as to the United States. But, the jury would hear at trial in Plaintiff's case in chief that Dr. Clark, the expert retained by the United States, who was consulted by the United States and prepared a report specifically addressed to counsel for the United States, is there to talk to them about Dr. Inouye's standard of care as it relates to Plaintiff's prima facie case. This would confuse and prejudice the jury. Other courts have recognized this serious risk of prejudice in holding that a party may not call an opposing party's expert in its case in chief. *See Labat v. Rayner*, No. CV 20-447, 2022 WL 1442982, at *2 (E.D. La. May 4, 2022) (holding that a plaintiff could not call defendants' experts in plaintiff's case in chief because it would allow plaintiff to piggyback on another party's trial preparation and would confuse the jury); *Atl.*

*Richfield Co. v. IMCO Gen. Const. Co.*, No. C01-1310L, 2005 WL 6762854, at *1 (W.D. Wash. Jan. 27, 2005) (holding that parties should not be permitted to call at trial experts retained by opposing parties); *Iljas v. Ripley Ent. Inc.*, No. 18-CV-00136-JST, 2019 WL 13399751, at *1 (N.D. Cal. Sept. 11, 2019) (holding that because each party is free to choose its expert witnesses and expert witnesses once retained remain the witness of the retaining party, a party could not call opposing party's expert witness at trial absent a showing of exceptional circumstances; and, the failure of a party to designate its own expert is not an exceptional circumstance).

Plainly, Plaintiff's attempted adoption of Dr. Clark's report is an attempt to get around the glaring issue that Plaintiff neglected to retain a qualified standard of care expert for her own case.  Plaintiff should not be permitted to confuse and prejudice the jury to correct this error by calling a defendant's expert in her case in chief.

### b.  Plaintiff Has Offered No Qualified Expert Testimony on Causation

Plaintiff must prove causation by expert testimony, and Plaintiff has not designated a qualified expert to opine on causation.  Instead, Plaintiff has designated a psychologist, who cannot testify as to causation under Virginia law because he is not a medical doctor.  Plaintiff's failure to designate a medical doctor to testify as to causation is fatal to her state law medical malpractice claim.

Only a medical doctor can offer testimony on causation under Virginia law.  *John v. Im*, 263 Va. 315, 321, 559 S.E.2d 694, 697 (2002) (citing *Combs v. Norfolk & W. Ry. Co.*, 256 Va. 490, 496, 507 S.E.2d 355, 358 (1998)).  In *John v. Im*, Plaintiff offered the testimony of a licensed psychologist to testify that the plaintiff suffered a mild traumatic brain injury in an auto accident.  *Id.* at 318, 695.  The trial court excluded the psychologist's opinion because the psychologist was not qualified to state a medical opinion that the plaintiff's injury was related to

the auto accident.  *Id.*  The Virginia Supreme Court held that the trial court properly excluded the causation opinion from the psychologist, reasoning that causation is a component of diagnosis, which is part of the practice of medicine.  *Id.* at 321, 697.   The Court further reasoned, because the psychologist was not a medical doctor, he was not qualified to state an expert opinion on the cause of the plaintiff's injury.

Plaintiff has designated two experts to testify against Dr. Inouye – 1) Erik Christensen, M.D., a forensic pathologist; and 2) Michael Hendricks, PhD, a psychologist.  Dr. Christensen has not been designated to offer any causation testimony.  Plaintiff has designated Michael Hendricks, PhD to testify, in pertinent part, "what led, or significantly contributed, to Dr. Lapp's suicide."  Ex. B at p.1.

In this case, Plaintiff must, in essence, draw a line of causation from Dr. Inouye's treatment of Dr. Lapp on March 18, 2021, to Dr. Lapp's suicide on May 18, 2021.  Plaintiff *must* do this through expert testimony under Virginia law.  And, under Virginia law, Plaintiff's expert who draws this line of causation for the jury must be a medical doctor.  Michael Hendricks is simply not qualified to render this opinion because he is not a medical doctor.

Because Plaintiff has no qualified expert designated to testify as to causation, Plaintiff's medical malpractice claim must fail as a matter of law.[5]

### VI.    Plaintiff is Not Entitled to Punitive Damages

Plaintiff claims punitive damages under both her constitutional claim and her state law claim.  Plaintiff is not entitled to such damages in either claim.

---

[5] To the extent that Plaintiff might attempt to argue that she can use the testimony of the United States' expert, Dr. Clark, to offer causation testimony in her case in chief, Plaintiff's June 12, 2023 Supplemental Disclosure of Expert Witness states plainly that Plaintiff does not "adopt [Dr. Clark's] legal assessment, presented at the end of the opinions section of his report, regarding the issue of 'intervening cause'."  The sentence referred to is the only portion of Dr. Clark's report that deals with causation.  In short, Plaintiff explicitly did not adopt Dr. Clark's causation opinion.  Any attempt to adopt that opinion at this point would be untimely.

**a. Because Plaintiff Cannot Show Deliberate Indifference by Dr. Inouye, Plaintiff Is Not Entitled to Punitive Damages With Respect to Her Constitutional Claim**

Plaintiff must show deliberate indifference to recover punitive damages with respect to her constitutional claim, and, as discussed above, she cannot do so as a matter of law.  Because Plaintiff's deliberate indifference claim under the Eighth and Fourteenth Amendments both fail as a matter of law, Plaintiff is not entitled to recover punitive damages.

**b. Plaintiff Is Not Entitled to Punitive Damages With Respect to Her State Law Claim Because Plaintiff Cannot Show Willful and Wanton Conduct**

Plaintiff must show willful and wanton negligence to recover punitive damages with respect to her state law claim, and she cannot do so as a matter of law.  The standard for willful and wanton conduct "nearly mirrors" the standard of deliberate indifference.  As discussed, Plaintiff cannot show that Dr. Inouye acted with deliberate indifference in this matter.  Furthermore, punitive damages are strongly disfavored under Virgnia law, and are reserved for the most egregious cases.  This is not such a case.

## CONCLUSION

For the foregoing reasons and for the reasons to be stated in oral argument, Defendant Dean Inouye, M.D., respectfully requests that this Court grant summary judgment as to all claims made against him in this matter.

**DEAN INOUYE**

By Counsel

/s/
Juliane C. Miller (VSB No. 34358)
Laura Lee Miller (VSB No. 89412)
Counsel for Dean Inouye
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
jcmiller@hccw.com
lmiller@hccw.com

# C E R T I F I C A T E

I hereby certify that on the 15th day of September, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Victor M. Glasberg, Esq.
VSB No. 16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703-684-1100 - Phone
703-684-1104 - Fax
vmg@robinhoodesq.com

Nickera S. Rodriguez, Esq.
VSB No. 95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703-684-1100 - Phone
703-684-1104 - Fax
nsr@robinhoodesq.com

Matthew J. Mezger, Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria,, VA 22314
703-299-3741/3799 - DD
703- 299-3983 - Fax
Matthew.Mezger@usdoj.gov
Kirstin J. O'Connor, Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria,, VA 22314
703-299-3741/3799 - DD
703- 299-3983 - Fax
kirstin.o'connor@usdoj.gov


/s/
Juliane C. Miller (VSB No. 34358)
Laura Lee Miller (VSB No. 89412)
Counsel for Dean Inouye

Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
jcmiller@hccw.com
lmiller@hccw.com