UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| LISA LAPP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case #1:23-cv-248 (MSN/LRV) |
| | ) | |
| THE UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

_____

MEMORANDUM IN OPPOSITION TO THE MOTION OF
DEFENDANT DEAN INOUYE FOR SUMMARY JUDGMENT

_____

Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
nsr@robinhoodesq.com

Counsel for Plaintiff

Table of Contents

Statement of Undisputed Facts Material to Dr. Inouye's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Judge Ellis Addresses Dr. Lapp's Mental Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Dr. Inouye Sees Dr. Lapp and What Dr. Inouye Knew . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Response to Dr. Inouye's Statement of Allegedly Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . 16

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     I.     Ms. Lapp is a Proper Plaintiff in This Lawsuit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     II.    Dr. Inouye Acted With Deliberate Indifference . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          A.  The Applicable Legal Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          B.  Dr. Inouye Exposed Dr. Lapp to a Substantial Risk of Serious Harm . . . . . . 23

          C.  Ms. Lapp's Claim Meets The Subjective
              Deliberate Indifference Test as Well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     III.   Plaintiff's Expert Evidence is Properly Before The Court . . . . . . . . . . . . . . . . . . 27

          A.  Michael Hendricks, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          B.  Michael Clark, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     IV.   Count III of the Complaint Should Go To The Jury . . . . . . . . . . . . . . . . . . . . . . . 32

     V.    Count IV for Wrongful Death, Should Go To The Jury . . . . . . . . . . . . . . . . . . . . 33

     VI.   Ms. Lapp's State Law Claims Against Dr. Inouye, Whether Styled
          Claims for Negligence, Gross Negligence, or Willful and Wanton
          Negligence, and for Punitive Damages, Should Go To The Jury  . . . . . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Plaintiff Lisa Lapp has sued defendant Dean Inouye, M.D. for failing to inform himself about the mental health history and proper treatment of the late Christopher Lapp, a mentally ill man who hanged himself after Dr. Inouye removed him from mental health care in the Alexandria Adult Detention Center ("ADC").  While discovery has confirmed what the complaint alleged, Dr. Inouye has seen fit to move for summary judgment.  At best for Dr. Inouye, his liability remains for a jury to decide and his motion should be denied.

<u>Statement of Undisputed Facts Material to Dr. Inouye's Motion</u>

A host of facts material to Dr. Inouye's liability are simply missing from his motion. Here, Ms. Lapp recites what she respectfully presents as facts indisputably material to Dr. Inouye's liability and thus his motion.  She then disputes certain of  Dr. Inouye's proffers.

1.  Christopher Lapp, a previously successful nuclear engineer, was stricken with bipolar I disorder with psychotic features and delusional disorder. In November 2018, he was charged with bank robbery and carjacking.  He remained incarcerated until his death in May 2021. Exh. 1.

2.  At the Fairfax jail following his arrest, Dr. Lapp was seen by psychiatrist John Wilson.  Dr. Wilson noted on November 20, 2018, Exh. 2, that Dr. Lapp was

> calm, cooperative, denies risk issues.  Has *serious mental issues but masks well*. [R]efuses treatment. . . .  Copious paranoia and gradiosity, though *fairly charming in presentation; could imagine p[atien]t evading mental health/legal system for prolonged periods of time based on preserved interpersonal skills*.  No interest in treatment. (Emphasis added).

3.  In due course, Dr. Lapp appeared before the Hon. T. S. Ellis, III, who found him incompetent to stand trial and ordered the Bureau of Prisons to determine if he might be restored to competency. Exh. 3.

-1-

4.   Dr. Lapp was housed at the Butner, N.C., Federal Medical Center ("Butner"). Maintaining he was not mentally ill, Dr. Lapp initially refused psychiatric medication.  This remained the case for months, and Judge Ellis was repeatedly so advised.  Exh. 4-6.

5.   At the urging of Chief Psychiatrist Logan Graddy, Dr. Lapp eventually consented to receive psychotropic medication: aripiprazole and mirtazapine. By report dated February 16, 2021, Butner's forensic psychologist informed Judge Ellis that Dr. Lapp, who had been "100% medication complian[t]," was no longer incompetent to stand trial.  While his bipolar disorder had been brought into partial remission, he "*does not believe he has a mental illness.*"  His prognosis was "fair," but "*should he discontinue treatment, his prognosis is poor. . . . [I]t is imperative he be maintained on this [medication] regimen to prevent the likelihood of psychological decompensation as mental health symptoms may wax and wane.*" (Emphasis added).  Exh. 7 at 6.

6.   On or about February 26, 2021, Dr. Lapp was transferred from Butner to the ADC, to be held pending a competency hearing before Judge Ellis. Butner provided him with a "bridge" supply of aripiprazole and mirtazapine.  Exh. 8 at 8611.

7.   Dr. Lapp and his medications arrived at the ADC on March 1, 2021, together with a packet of explanatory medical documents from Butner, all signed for by an ADC employee.  *Id.* These pages provided the following information:

*        Advice that Dr. Lapp suffered from "Bipolar I Disorder: Current or Most Recent Episode Manic: in Partial Remission," as well as "Other specified mental disorder" and  "Unspecified mental disorder."   The status of each was "current." *Id.*

\*        Advice that Dr. Lapp was taking aripiprazole and mirtazapine, with their doses given, and the caution: "*All medications to be continued until evaluated by a physician unless otherwise indicated.*"  *Id.* (emphasis added).

\*        The name, address and telephone number of the person filling out the forms. This was one V. Barnes, a Psychiatric Mental Health Nurse Practitioner, Board Certified ("PMHNP-BC") working at Butner.  *Id.* at 8613.[1]

<u>Judge Ellis Addresses Dr. Lapp's Mental Status</u>

8.  At a hearing on March 5, 2021, Judge Ellis found Dr. Lapp competent to stand trial "at this time." Exh. 9 at 10:12.  While Judge Ellis stated that he would keep Dr. Lapp housed at Butner because "he has physicians and consultants that he's been consulting there," *Id.* at 22:12-18, 26:9-13, his written order did not include a directive that Dr. Lapp be returned to Butner, and he remained in Alexandria.  Exh. 10. On April 16, 2021, Dr. Lapp pled guilty to reduced charges, and Judge Ellis set his sentencing to take place half a year later, on October 8, 2021.  Exh. 11 at 50:13.

9.  When Dr. Lapp told Judge Ellis on April 16, 2021 "I was not prescribed by the psychiatrist presiding in this facility in Alexandria," *id.* at 12:19-23, Judge Ellis asked:

The Court:     All right. So you did see a doctor here, Dr. Lapp, and that doctor concluded that you didn't need to take the medicine anymore?

The defendant:  That is correct, Your Honor.

---

[1]A person holding a PMHNP-BC certification can prescribe medicine. *See* https://www.registerednursing.org/articles/psychiatric-nurse-practitioner-vs-psychiatrist/.

> The Court:     Well, it is difficult to know how much that doctor knew about your history. So what I'm going to do is I'm going to communicate with Dr. Graddy. And, Mr. Flood, you should do the same thing. In fact, I may make that call here as soon as we finish the plea. Because Dr. Lapp, if you need the continued care of Dr. Graddy, I want to be sure that you get it.

*Id.* at 14:24-15:9.

10.  Consistent with his insistence that Dr. Lapp receive ongoing care, in the same order as he found Dr. Lapp guilty and set sentencing, Judge Ellis specified:

> To ensure continuity of treatment and mental health care for defendant, and with the agreement of the parties, the United States Marshals Service is **DIRECTED** promptly to return defendant to FCI Butner so defendant may remain under the care of Dr. Graddy.  The Clerk of Court is directed to send a copy of the Order to the U.S. Marshals Service, to FCI Butner, to Dr. Graddy at FCI Butner, and to all counsel of record.

Exh. 12 (emphasis in original).  The government, however, neither abided by Judge Ellis' order nor moved to modify or vacate it, and Dr. Lapp remained in Alexandria.[2]

11.  Dr. Lapp remained at the ADC, where defendant Dean Inouye, M.D. summarily terminated his mental health care and medication.  One month after his plea hearing, Dr. Lapp hanged himself.  Exh. 13.

<u>Dr. Inouye Sees Dr. Lapp and What Dr. Inouye Knew</u>

12.  Pursuant to Code of Va. §37.2-500 et seq., the City of Alexandria established the Alexandria Community Services Board ("CSB") to provide mental health and other services to qualified recipients in its Old Town office, in patient/client homes, in community centers, and to ADC inmates. Exh. 14 at 18:12-19, 13:22-14:15; Exh. 15.

---

[2]The government's default in this regard is addressed in Ms. Lapp's pending motion for partial  summary judgment against the United States.  ECF 82.

13.   Work at the CSB is governed by CSB policies that all employees are required to be familiar with and follow. Exh. 14 at 12:21-13:20. The policies govern all CBS work; there are no policies that apply specifically to ADC inmates. *Id.* at 85:2-5.

14.   On March 3, 2021, Lauren Broderick, a Qualified Mental Health Professional-Adults, met with Dr. Lapp and wrote her initial mental health assessment for the CSB.  Exh. 16.  Ms. Broderick noted that Dr. Lapp, while diagnosed at Butner with Bipolar Disorder and treated with aripiprazole and mirtazapine, disagreed with his diagnosis, denied any mental health distress, and was "simply taking [his medication] as it was prescribed by a psychiatrist related to his legal proceedings." *Id.* Dr. Lapp "presented with disorganized thoughts and would make vague statements about 'evidence' [and] 'threats from overseas,'" and had "poor insight."  *Id.* Dr. Lapp "reported engaging in competency restoration" and "recalled being restored."  *Id.* Since Dr. Lapp reported being "agreeable to a psychiatric referral," Ms. Broderick referred him "to psychiatry," *id., i.e.,* Dr. Inouye.

15.   Dr. Inouye has been employed by the CSB since 2013 as a clinical psychiatrist. As part of his job, he provides mental health services to ADC inmates.  He is the only CSB psychiatrist providing care at the ADC, except when he is on leave.  Exh. 17 at 12:14-21. He works 20 hours per week in his CSB office, and 20 at the ADC. *Id.* at 13:3-12.

16.   Dr. Inouye understands that his CSB position description set forth his responsibilities as a CSB psychiatrist. *Id.* at 16:16-19. This includes the requirements that he "provide complete and detailed psychiatric evaluation and diagnostic services," "use the time allotted for initial psychiatric evaluations and medication management in a manner that will ensure therapeutic environment and safety," and "review client/patient clinical records to assure adequacy and proper prescription of medications." Exh. 18.

17.  On arriving at the ADC shortly before 1:00 p.m. on March 16, 2021, Dr. Inouye learned he was scheduled to see Dr. Lapp as his first appointment, at 1:00 p.m.  Exh. 17 at 108:17-109:8.  He printed out Dr. Lapp's documents that "[he] thought [he] could conceivably might refer to" or all those he deemed "relevant," including Butner's transport documents summarizing Dr. Lapp's medical problems and medications and the record of medication, *Id.* at 110:18-22, 114:9, 115:14-16;  117:22; Exh. 19 at 8684.  Dr. Inouye confirmed Dr. Lapp had taken his "bridge" medications as prescribed. Exh. 17 at 164:14-15.

18.  Dr. Inouye "probably did not review any of [Dr. Lapp's] records prior to meeting him," as he usually waited until he was with his patient to review records.  *Id.* at 112:5-9. He did, however, review Ms. Broderick's notes (*see* ¶14, *supra*) regarding Dr. Lapp's mental issues, Exh. 17 at 100:16-21, but did not speak with her about Dr. Lapp. Exh. 20, #14.

19.  Dr. Inouye understood that Dr. Lapp had been referred to him for continuity of medication for a diagnosis of bipolar I disorder.  Exh. 17 at 133:1-134:11.  He "presumed" that Dr. Lapp was "probably prescribed medication by a psychiatrist."  *Id*. at 137:9-11.  He understood that the diagnosis had been made at Butner, and knew that Butner was a federal prison with a mental health department that conducted competency restoration; indeed, he had received other restored patients from Butner. *Id.* at 276:14-277:2, 135:9-136:7. Dr. Inouye was trained as a forensic psychiatry fellow and had learned to perform competency evaluations.  *Id.* at 229:9-14.  According to his *curriculum vitae,* he testified as an expert in cases addressing "competency to stand trial."  Exh. 21. (Oddly, he professed not to know what Ms. Broderick meant by writing that Dr. Lapp "recalled being restored."  Exh. 17 at 102:2-9. Nor did he ask her. *Id.* at 102:10-11.)

20.   While initially testifying that he never saw any documents regarding Dr. Lapp's bipolar I diagnosis, *id.* at 188:7-17, Dr. Inouye conceded that he saw the Butner transfer documentation referenced in ¶7, *supra* before seeing Dr. Lapp. *Id.* at 186:17-188:2.

21.   Dr. Lapp was unavailable on March 16, as the ADC was in lockdown.  Dr. Inouye thus attempted to assess his mentally ill patient via the jail's attorney telephone line, with Dr. Lapp in his cell on a portable phone and Dr. Inouye in his office.  The phone was in use.  Dr. Inouye did not see or speak with Dr. Lapp on March 16, 2023.  Exh. 22 at 001.

22.   Having, in his view, found no "psychiatric records" from Butner at the ADC, Dr. Inouye "attempted to ask" Ms. Broderick if she had requested such records from Butner. Exh. 17 at 139:1-15.  Ms. Broderick was not working in the jail that day and he did not speak with her.  He did nothing else that day in an attempt to secure the records he sought from Butner.  He did nothing to that end the following day, or the next day, March 18.  Nor did he ever request or direct anyone to get the Butner records he wanted. *Id.* at 140:5-141:9.

23.   Dr. Inouye had an office in the CSB's Old Town office, equipped with a telephone, computer, and access to internet. Exh. 14 at 104:8-10; Exh. 17 at 258:7-20.  He could also use the CSB's fax machine. Exh. 14 at 96:13-97:8.

24.   It is "not uncommon" for CSB personnel to call an inmate-patient's prior places of incarceration to secure information for their "jail initial assessment." *Id.* at 34:13-35:1; 38:1-10; indeed, this is commonplace. *Id.* at 38:12-17.  Sharing information with other CSBs that have previously provided services to an incoming Alexandria inmate is also "normal and appropriate." *Id.* at 36:15-37:2.  Sometimes an incoming inmate will not have or provide relevant information, so the CSB will seek it out. *Id.* at 41:5-10.  CSB personnel have routinely requested explanatory information from other jurisdictions when needed to

serve a patient. *Id.* at 39:7-21. These protocols apply to psychiatrists, who can either make inquiries themselves or have others make them on their behalf. *Id.* at 42:13-43:7. This would include securing input from previous prescribers of medication. *Id.* at 46:6-47:1.

25.  The CSB is aware of no impediments to the CSB's receiving information from the Butner correctional facility on an ADC patient previously treated at Butner. *Id.* at 55:5-15. Assistant CSB Director Teumer is aware of no instance when a request for such information was denied. *Id.* at 55:17-56:10.

26.  The government's deposition designee to address Butner's provision of health documents and information about its patients to other correctional institutions testified he handles such inquiries "probably one per week." Exh. 23 at 9:6-15; 24:20-26:3.

27.  Dr. Inouye is aware of the self-evident medical truisms that it is helpful to have accurate information about a patient's mental health past. Exh. 17 at 76:8-77:5; that the more records he has and the better they are, the more they help him in his initial assessment of a patient and his decision how to deal with medication, *id.* at 73:11-20; that receiving more complete and accurate information on a patient allows for a better diagnosis and treatment, *id.* at 78:10-22; that understanding details of past treatment may lead to a better understanding of which treatments are viable alternatives and which to avoid, *id.* at 35:11-20; 154:8-9, and otherwise provide useful information to inform how to treat a patient, including specifically an ADC patient, *id.* at 163:16-20. Indeed, the CSB's medical director emphasized the need for prior medical records at an initial patient meeting, *id.* at 153:9-14. Dr. Inouye knew that these principles apply to review of prior medication trials, which may be valuable to select treatment medications and rule out others. *Id.* at 39:15-20.

-8-

28.  Dr. Inouye was equally conversant with the converse elementary principles:  lack of reliable information would limit his efforts to provide treatment, *id.* at 77:7-78:4, and having less accurate and complete information on a patient impedes making a proper diagnosis and treatment plan.  *Id.* at 78:10-22.

29.  Dr. Inouye was aware that patients, like all people, can have selective memories; *id.* at 76:1-2; that sometimes information given by patients can be inadequate, *id.* at 76:2-4, and that gathering more information is the only way to establish the illness of a patient in denial, *id.* at 81:10-82:2 – "denial" being a psychological defense mechanism. *Id.* at 79:10-12.  Dr. Inouye recognized that patients diagnosed with bipolar disorder sometimes lack insight into their disorder, *id.* at 74:3-5, 233:1-13 –  "insight" being the capacity to appraise whether one's thoughts, feelings, behaviors, perceptions and planned actions may be appropriate and realistic. *Id.* at 43:22-44:9.  Dr. Inouye knew that because of lack of insight, patients with bipolar disorder and delusional disorder sometimes decline treatment. *Id.* at 233:14-16. As Dr. Inouye conceded to Judge Ellis at the show-cause hearing, bipolar patients can deny being ill and even have amnesia regarding a manic episode.[3] Exh. 24 at 22:23-25. Indeed, those very thoughts were in his mind when speaking with Dr. Lapp. *Id.* at 22:22-23.

30. Dr. Inouye was aware of the truism that physicians should reserve the making of medical decisions to themselves. Exh. 17 at 52:22-53:1.

_____

[3]Dr. Inouye did not volunteer this.  When Dr. Inouye recounted that Dr. Lapp denied having symptoms of bipolar disease, Judge Ellis interrupted with: "I take it you also knew that people who were bipolar and had manic phases often say, after it's over, 'I don't have anything.'"  Exh. 24 at 22:16-21. It was only then that Dr. Inouye conceded the point.

31.  Dr. Inouye was aware that bipolar disorder can be recurrent; *id.* at 37:20-22; that delusional disorder does not usually come and go; once it begins it is usually present; *id.* at 38:2-5; and that a person can develop symptoms of a psychiatric disorder or acute symptoms after a period in which he had shown no symptoms.  *Id.* at 220:16-19.    32.  With regard to medication for mental illness, Dr. Inouye agreed that a psychiatrist should strive to ensure that an inmate with mental illness be treated with the most suitable and clinically appropriate medication, *id.* at 56:10-17; that medication is recommended for bipolar patients who otherwise are treatment resistant, *id.* at 233:17-234:20, and that maintenance treatment is recommended following a manic episode.  *Id.* at 57:18-20.

33.  Dr. Inouye was aware of the risk of suicide in mentally ill persons.  He knew that the possible consequences of poor adherence to pharmacotherapy included illness destabilization, with increased relapse and recurrence of mood episodes and high suicide risk. *Id.* at 46:17-22.  He knew that the risk of suicide may increase in the depressive phase of bipolar illness. *Id.* at 47:5-15. He knew that a co-morbid condition, *i.e.*, a co-occurring psychiatric condition – can contribute to suicidality.  *Id.* at 47:19-48:8.[4]

34.  Dr. Inouye believed, and told Dr. Lapp, that when Dr. Lapp returned to Butner he would be probably be put back on the very medications that Dr. Inouye proceeded to withdraw from him.  Exh. 24 at 24:9-13.

35.  Dr. Inouye recognized that the fundamental policy goal for correctional medical services should be to provide the same quality of mental health services to each patient in the criminal justice system that should be available in the community, Exh. 17 at 53:2-8; that

---

[4]Dr. Inouye was aware, from Butner's medical documents, Exh. 8, that Dr. Lapp suffered from two additional mental health conditions as well as bipolar disorder.

the CSB's non-ADC and ADC clinics should try to function with "no difference," *id.* at 153:17-21; and that the goal of correctional psychiatrists should be to provide evidence-based treatment in jails and prisons. *Id.* at 54:21-55:3.  Dr. Inouye knew that mental health patients could be seen at the ADC over time, *id.* at 234:21-235:12; and confirmed that he himself had followed an ADC inmate for over a year.  Exh. 20, #16 at 10.

36.  It is unclear how much time Dr. Inouye actually spent speaking with Dr. Lapp on March 18.  His progress note records 70 minutes, Exh. 22 at 002 (top right bates number), but he testified that this time included waiting time of perhaps 30 minutes and an initial review of records of around 15 minutes, so that he would have spoken with Dr. Lapp for "half the time of the appointment."  Exh. 17 at 131:7-12. While it was "too long ago" for Dr. Inouye to recall what records he reviewed before meeting Dr. Lapp, Dr. Inouye estimated that he spoke with Dr. Lapp for about 40 minutes. *Id.* at 28:3-8.[5]

37.  Dr. Inouye claimed to have "no background information" on Dr. Lapp's treatment and was "puzzled as to why [Dr. Lapp] would not know why he had been diagnosed with Bipolar I Disorder."  Exh. 24 at 22:6-9.  At the time, Dr. Inouye had before him Butner's medical transfer documentation provided by a board-certified psychiatric mental health nurse practitioner (*see* n.1 at 3*, supra*), attesting to Dr. Lapp's bipolar and

---

[5]*But see* Dr. Inouye contrary testimony about when he reviewed records, at ¶20 *supra.* As a doctor, Dr. Inouye is a remarkably poor medical historian. He told the sheriff's deputy investigating Dr. Lapp's death that Dr. Lapp had been on involuntary court-ordered medication and that the court's order had lapsed on his arrival at the ADC (Exh. 25 at 1:44-2:55), all of which was false.  He told Judge Ellis that Dr. Lapp had not completed his bridge medication of Remeron (mirtazapine), taking it only for "a few days" (Exh. 24 at 20:2-4).  This too was false, as the ADC's medication record confirms, Exh. 19 at 8684, and as Dr. Inouye conceded in his deposition. Exh. 17 at 164:14-15.  Dr. Inouye's demonstrably false explanations are invariably consistent with relieving him from responsibility for Dr. Lapp's fate.

other disorders and his medications, to be continued pending medical review.  He dismissed this documentation as "a general document.  It was not a medical document."  Exh. 25 at 3:97-98.  As a result, "my only source of information at that point was Dr. Lapp himself, and I wasn't sure where to go with that."  Exh. 24 at 23:1-3.

38.  Dr. Inouye testified that if a patient cannot explain why he is taking a medication but can identify the doctor who prescribed it, his "approach to previous medical treatment is to seek the documentation of that treatment first, to review it, and then if I have questions, to call the physician." Exh. 17 at 62:15-19, 63:13-16.

39.  Dr. Inouye did not abide by his stated approach in the case of Dr. Lapp. Not being "sure where to go," not having received – by reason of not requesting – further information from Butner's mental health staff, not having consulted any other mental health professionals, Exh. 20, #2 at 2, professing ignorance why Dr. Lapp had been diagnosed with Bipolar I disorder, Exh. 24 at 21:18-19, but aware that his disorder was in partial remission, Exh. 17 at 134:9-12, Dr. Inouye saw fit to base his assessment and non-treatment of Dr. Lapp on the glib statements of his mentally ill client, a man whom psychiatrist John Wilson described as early as in November 2018 as:

> calm, cooperative, denies risk issues.  Has serious mental issues but masks well. [R]efuses treatment. . . .  Copious paranoia and gradiosity, though fairly charming in presentation; could imagine p[atien]t evading mental health/legal system for prolonged periods of time based on preserved interpersonal skills. No interest in treatment.

*See* ¶2 at 1, *supra*.  Alone among the seven mental health professionals who assessed or

worked with Dr. Lapp since his mental health and criminal crisis,[6] it was Dr. Inouye who saw fit to rely solely on his presumptively (and actually) ill patient's benign self-assessment, without securing information from prior providers, to the point of summarily terminating the treatment protocol known to have brought Dr. Lapp back to mental competency.

40.   Dr. Lapp told Dr. Inouye that he, Lapp, "had read about Bipolar I Disorder while he was at Butner, and said he didn't think he met criteria for Bipolar I Disorder."  Exh. 24 at 23:24-24:1.  Yet Dr. Inouye perfectly knew that bipolar patients could be misleading sources of information; indeed, he confirmed to Judge Ellis at the show-cause hearing that even as he spoke with Dr. Lapp he was aware that bipolar patients can deny being ill and even have amnesia regarding a manic episode.  *Id.* at 22:22-25. He knew that Dr. Lapp had been declared incompetent, and testified that this "wasn't a surprise."  Exh. 17 at 272:21-273:1 He affirmed at his deposition that he does not disagree with Butner's bipolar I diagnosis for Dr. Lapp – "not at all" – and that he would "not have rejected [Butner's] diagnosis" if he "had [the Butner] report*"* – a report, or the equivalent thereof, that he never requested.  *Id.* at 312:13-313:8.  He even told Dr. Lapp he expected that once returned to Butner, Dr. Lapp would be returned to the medication he, Dr. Inouye, was not renewing.  Exh. 24 at 24:9-13. Notwithstanding this knowledge and understanding, given his self-imposed ignorance of Dr. Lapp's mental health past and needs, and acquiescing in Dr. Lapp's glib but woefully innocuous presentation, he removed Dr. Lapp from mental health services at the ADC.

---

[6]Drs. DeRight, Wilson, Graddy, Armstrong, Wood, and Pennuto, not all of whom worked together or even agreed as to Dr. Lapp's diagnosis, all agreed that Dr. Lapp was seriously mentally ill as well as singularly glib and dismissive of his condition, including his need for medication.  Exhs. 2, 4-7, 26, 27.

41.  Dr. Inouye prepared a note of his March 18 meeting with Dr. Lapp the same day. Exh. 22 at 002-007 (upper right corner).  His entire entry addressing his cessation of medication reads as follows: "*I counseled him that I was not going to resume his previous aripiprazole dose* due to a lack of current clinical indication or supporting documentation from Butner, and he concurred."  *Id.* at 003 (emphasis added).  Dr. Inouye confirmed at his deposition that what he wrote was accurate. Exh. 17 at 133:9-16.[7]

42.  Dr. Inouye's March 18 visit with Dr. Lapp marked Dr. Lapp's last interaction with mental health services at the ADC.  There is no record of any interaction between mental health personnel and Dr. Lapp after Dr. Inouye's March 18 visit, and Dr. Inouye is

---

[7]Dr. Inouye's self-exculpatory statements made over two months later, after Dr. Lapp killed himself – and now recited to the Court on summary judgment – to the effect that it was Dr. Lapp who told him he did not want to take his medication are impeached beyond redemption by his progress note made the day he spoke to Dr. Lapp.  *See also* Dr. Lapp's explanation to Judge Ellis on April 16, 2023 that he was not taking medication because "I was not prescribed by the psychiatrist presiding in this facility in Alexandria."  Exh. 11 at 12:19-23.  While Dr. Lapp at all times contended he was not mentally ill (Exh. 7 at 6), he maintained "100% medication compliance" once he started his medication at Butner in 2020, *id.*, and was also compliant with the post-Butner "bridge" prescriptions through mid-March 2021.  Dr. Inouye knew this.  Exh. 17 at 164:14-15. Nor did Dr. Inouye have Dr. Lapp sign a form refusing medication, although he testified "I would have asked him to sign this form, just to document that."  *Id.* at 354:19-355:5. Claiming that the form was "not available at that time," *id.,* Dr. Inouye made no mention of Dr. Lapp's alleged refusal in his note, notwithstanding his recognition that a patient's refusal to take a recommended medication could be a significant point to be recorded, depending on the medication and its purpose, *id.* at 353:21-354:6, and that he would make note of a patient's reticence to take medication. Exh. 17 at 24:4-18.  It is consistent with Dr. Lapp's unchanged benign view of his condition that he did not oppose Dr. Inouye's decision to stop his medication; indeed, after having been seen by a host of doctors and therapists who found him ill and in need of psychotropic medication, Exhs. 2, 4-7, 26, 27, he was presumably pleased to have found in Dr. Inouye a psychiatrist who accepted his benign self-evaluation at face value.  Dr. Inouye's newly-minted undertaking to blame Dr. Lapp for refusing to take his medication is also in derogation of his own testimony that his progress notes, focused on medication management, make note of anything arising from medication administration to an ADC patient.  All the above is apart from the inadmissibility of Dr. Inouye's hearsay regarding what Dr. Lapp allegedly told him.  *See* n.8 at 16, *infra.*

-14-

aware of no interaction between any CSB personnel and Dr. Lapp after that visit.  Exh. 20, #15 at 9-10; Exh. 17 at 198:22-199:3.  On April 7, 2021, as a bureaucratic matter, a final entry was made in the CSB record to the effect that Dr. Lapp was "currently not utilizing mental health services, he will be closed to jail mental health services at this time."  Exh. 28. As a practical matter, he was "closed" to such services as of the time Dr. Inouye left him.

43.  Dr. Lapp was "closed" to mental health notwithstanding that Dr. Inouye was left with "unanswered questions" and the belief that Dr. Lapp "would benefit from further assessment."  Exh. 17 at 321:4-17.  He was concerned that Dr. Lapp could have a recurrence of a manic episode. *Id.* at 328:10-15.  Dr. Inouye was also aware that the risk of suicide in bipolar I patients decreases if they are treated appropriately with psychotropic medicine and receive follow-up care and monitoring. *Id.* at 255:6-19. He was aware as well that separation from family, fear of incarceration, and the approach of a sentencing hearing could be risk factors for suicide. *Id.* at 256:2-9.

44.  Dr. Inouye was aware, finally, that suddenly stopping certain medication, including Abilify (aripiprazole), can lead to recurrence of bipolar disorder symptoms, and this medication should be tapered down, not abruptly stopped. *Id.* at 245:12-20, 247:13-248:7, 252:19-253:6. In Dr. Lapp's case, he claims he would have tapered the 15 mg of Abilify to 10mg and observed Dr. Lapp "for several months," *id.* at 248:3-7  – this, with regard to medication he did not renew.

45.  Notwithstanding his concerns, Dr. Inouye followed up with no one regarding Dr. Lapp.  *Id.* at 322:16-323:8.  Dr. Lapp's case remained closed to the CSB. The next CSB entry following notice of the closure of his case was of his suicide.  Exh. 22 at 009.

46.   At the time he discontinued Dr. Lapp's mental health treatment and medication, Dr. Inouye had no knowledge or experience regarding the amount of time it may take for a prisoner to be sentenced, nor did he know when Dr. Lapp would be sentenced or when he would leave the ADC.  He had, however, continuously seen, treated, or supervised an ADC inmate for more than one year.  Exh. 20, #16 at 10.

<u>Response to Dr. Inouye's Statement of Allegedly Undisputed Facts</u>

Ms. Lapp here addresses Dr. Inouye's factual proffers she disputes. A great many of Dr. Inouye's averments are immaterial to the matters at bar and are not addressed.

10.   While Dr. Inouye claims to have reviewed past medical records "that were available to him," he does not identify those records, nor why others were "not available." A host of records – from the Fairfax CSB (*see* ¶¶2 and 24, *supra* at 1, 7-8, and Exh. 14 at 36:15-37:2) and, of course, from Butner, were available for the asking, which never came.

13.   Dr. Inouye understood that the very purpose of his meeting with Dr. Lapp was to arrange for continuity of care and medication. Exh. 17 at 189:11-15.

14, 15, 24.   Dr. Inouye's self-serving statements regarding what Dr. Lapp allegedly told him are uncorroborated, flatly impeached by admissible evidence, and inadmissible as a matter of law.[8]

---

[8]Dr. Inouye's hearsay that Dr. Lapp refused medication is inadmissible.  The statement does not qualify under Fed. R. Evid. 804(4)(B), as it is not a description of "medical history, past or present symptoms or sensations; their inception; or their general cause."  Nor is it admissible under Code of Va. § 8.01-397 and Va. R. Evid. 2:804(b)(5) since there is zero corroboration of Dr. Inouye's claim and it is flatly contradicted by his own note and by Dr. Lapp's recorded statement to Judge Ellis and his similar statement to psychologist Michael Hendricks.  Exh. 29 at 173:18-174:6.  Dr. Inouye's hearsay should not be considered by the Court.

27.  This is not incorrect, but Dr. Inouye took no steps to secure the release he claims he thought he needed, nor is there any notation of refusal to provide such release. But no release was in fact required.  Butner could provide information to the ADC without any release.  *See* 45 C.F.R. § 164.512(k)(5); *cf. United States v. Gray,* 59 F.4th 329, 333 (8th Cir. 2023) (Bureau of Prisons not covered by federal release obligations).

29.  This is correct, but Dr. Inouye said exactly the opposite when questioned by the ADC investigator.  *See* n. 5 at 11, *supra.*

30.  This is correct, but Dr. Inouye told the ADC investigator that this was because the involuntary medication order, which never existed, had lapsed – all being false.  *Id.*

32.  A doctor's opinion on a matter of law does not constitute admissible evidence.

33.  As Dr. Inouye's note confirms, Exh. 22, what occurred is not that Dr. Lapp "refused" medication, but that Dr. Inouye did not renew the prescription, which was fine with Dr. Lapp who always believed he was not ill and needed no medication.

35.  Dr. Lapp hanged himself.  This qualifies as a "behavioral disturbance or issue."

48.  Dr. Hendricks, a licensed clinical psychologist with an ongoing clinical practice, Exh. 29 at 31:14-23, Exh. 30, did not so "concede," but stated uncontested facts in response to deposition questions. The prerogatives of a Virginia clinical psychologist, set forth in Code of Va. § 54.1-3600, include "'Diagnosis and treatment of mental and emotional disorders' which consists of the appropriate diagnosis of mental disorders according to standards of the profession and the ordering or providing of treatment according to need."

49.  *See* response to preceding item.

50.  While psychologists do not prescribe medicine, Dr. Hendricks testified, however:

-17-

> I have actually done more training than most psychologists in psychopharmacology, and actually for several years taught clinical psychopharmacology at the graduate level and have been, I'm missing the word, designated an expert in clinical psychopharmacology in court in cases where that was relevant. That doesn't mean that I can prescribe, but it does mean that I have a broader and deeper understanding of not just what medications do what, but how they actually work in the brain and the body and what they do, and why there are side effects, and how -- what those side effects might be, and how they interact with the condition that they are supposed to be treating, which often is not exactly what they're treating.

Exh. 29 at 29:4-21.  As a result, Dr. Hendricks was occasionally asked by doctors how best to treat their patients with psychotropic medications. *Id.* at 66:8-19.

Argument

At bar is a summary judgment motion, not a trial on written submissions.  The Court does not resolve disputed material facts now; it determines whether any exist.  Dr. Inouye elides the devastating consequences for his motion of his own admissions (¶¶27-35, *supra*), as well as admissible expert evidence set forth at 24-25, *infra*, damning his treatment, such as it was, of Dr. Lapp.  While attacking the admissibility of Ms. Lapp's expert evidence – something addressed *infra* at 26-33, Dr. Inouye does not attempt to meet that evidence on the merits, nor could he, as that would concede disputes of material facts or opinions, precluding summary judgment.  Dr. Inouye relies for the most part on his own testimony, regardless of whether it is contested or even admissible (as in the case of his recitation of what Dr. Lapp allegedly told him), and on disputed experts' views.  The result does not begin to bear the burdens Rule 56 imposes upon a movant.  In the circumstances, Ms. Lapp will (a) address Dr. Inouye's threshold standing challenge, (b) present the grounds supporting her claims against him, and (c) address such remaining arguments of Dr. Inouye's as may require response.

-18-

I. <u>Ms. Lapp is a Proper Plaintiff in This Lawsuit</u>

Administration of estates in Virginia is typically pursuant to Code of Va. § 64.2-508

*et seq.*, which require the administrator to collect the assets of the estate, pay its debts, and

see to the distribution of assets per a will or the laws of intestacy.  A separate statute, Code

of Va. § 64.2-454 provides for the certification of an administrator solely to bring or defend

"a civil action for personal injury or death by wrongful act, or both, arising within the

Commonwealth."  Lisa Lapp was appointed under §64.2-454, to file the instant suit for the

sole benefit of her and Dr. Lapp's sole child, who is also the sole beneficiary Dr. Lapp's

estate.  Exh. 31.  She has filed suit under this limited statutory authority, which has not been

challenged or revoked.  Her certification carries the force of Virginia law.[9]

II. <u>Dr. Inouye Acted With Deliberate Indifference</u>

Dr. Inouye's admissions detailed *supra* at ¶¶ 27-35; common sense; the expert

analyses of Michael Hendricks, Ph.D. (Exh. 30) and Michael Clark, M.D., (Exh. 32)

excoriating Dr. Inouye's failure to educate himself about Dr. Lapp's mental health past and

treatment; his ignoring the known diagnosis and treatment regimen of a major mental health

---

[9]Beyond that, there is zero evidence that the Lapps were even aware of solely litigation-oriented executory or the statute that enabled it, or had the least contemplation of post-mortem litigation not to be brought or defended by either of them following the death of the other.  Ms. Lapp categorically denies this. Exh. 1, ¶¶ 4-6.  Where a term in a contract "admit[s] of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time," *Berry v. Klinger,* 300 S.E.2d 792, 793 (Va. 1983), parol evidence is admissible to determine the intent of the parties, and a court should "give 'great weight' to the parties' own 'interpretation and dealings with regard to the contract terms' if otherwise compatible with the law."  *Vilsek v. Vilsek,* 612 S.E. 2d 746 (Va. Ct. App. 2005) (ambiguous prenuptial agreement). The "ordinary meaning" rule also supports Ms. Lapp's permissible service as estate representative for the limited purpose of bringing the instant suit.  *See Crain v. Craig,* 721 S.E.2d 24 (Va. 2012) ("nothing suggested that the decree was using [the term'gross'] in the unusual sense it carries in the civil service regulations").

center and relying instead on the glib, ignorant and, indeed, symptomatic denials of a delusional patient – all this condemns Dr. Inouye, partially out of his own mouth, for having acted in reckless disregard of the known risks facing Dr. Lapp resulting from the withdrawal of his medication.

A.   The Applicable Legal Standard

While awaiting sentencing, Dr. Lapp was classified as a pretrial detainee, in the custody of the Marshals Service.  Exh. 33. Ms. Lapp agrees with Dr. Inouye that the right of pretrial detainees to adequate medical care is governed by the Fourteenth Amendment's Due Process Clause.  But the agreement ends there.

Historically, the legal standard applicable to medical claims brought by pretrial detainees arose out of *non-medical disputes brought by convicted prisoners*.  The seminal case is *Farmer v. Brennan*, 511 U.S. 825 (1994), a prison rape case brought under the Eighth Amendment's prohibition of "cruel and unusual punishment."  The *Farmer* standard required the convicted inmate to show not only objective unreasonableness by the defendant, but the defendant's subjective awareness of the resulting risk of harm.[10]  As the Court observed:

> The Eighth Amendment outlaws cruel and unusual "punishments," not "conditions," and the failure to alleviate a significant risk that an official should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment under the Court's cases.

---

[10]Even then, there was an exception for risk of harm sufficiently great that any reasonable person would have appreciated it.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . .  and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."*Farmer,* 511 U.S. at  842.

*Id.* at 826.  This standard was thereafter applied to all prisoners' claims, including medical claims, and it remains the law for medical claims brought by convicted inmates.

In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Court addressed whether the Eighth Amendment standard would apply to a pretrial detainee bringing a Fourteenth Amendment Due Process claim for excessive force. Observing that "the language of the two clauses differ," *id.* at 400, and that pretrial inmates, "(unlike convicted prisoners) cannot be punished at all," *id.*, the Court held that the applicable standard for the pretrial detainee's claim "is solely an objective one." *Id.* at 397.  Four circuits have ruled that medical claims brought by pretrial detainees are now subject only to *Kingley's* objective unreasonableness inquiry.  *Miranda v. County of Lake*, 900 F.3d 335, 351-52 (7th Cir. 2018) (*Kingsley* "disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting"; the Supreme Court "has been signaling that courts must pay careful attention to the different status of pretrial detainees"); *Gordon v. County of Orange*, 888 F.3d 1118, 1123-24 (9th Cir. 2018) (prior decisions governing medical claims by pretrial detainees "cast . . . into serious doubt" by *Kingsley;* "logic dictates extending the objective deliberative indifference standard . . . to medical care claims"; *Darnell v. Piniero*, 849 F.3d 17, 36 (2d Cir. 2017) ("Supreme Court's decision in *Kingsley* now dictates that deliberate indifference be measured objectively in due process cases"; *Helphenstine v. Lewis Cnty.,* 60 F.4th 305 (6th Cir. 2021) (same).[11]

---

[11]To date, the Fifth, Eighth, Tenth and Eleventh Circuits have chosen to confine *Kingsley* to its factual context of excessive force. *See, e.g.,Whitney v. City of St. Louis*, 887 F.3d 857 (8th Cir. 2018); *Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272 (11th Cir. 2017).

In the Fourth Circuit, "[t]he 'precise scope' of this Fourteenth Amendment right remains 'unclear.'" *Mays v. Sprinkle,* 992 F.3d 295, 300 (4th Cir. 2021). While the Fourth Circuit in the past routinely used the traditional *Farmer* objective and subjective tests for prisoners' medical claims, "we have not directly addressed the import of *Kingsley*" for pretrial detainee claims. *Id.* at 301 n.4.  In recent cases of this sort in which a subjective test was applied, "neither party raised *Kingsley* and the discussion should not be read to resolve this issue." *Id.*  In this connection, the court observed: "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Id. See also Stevens v. Holler*, 68 F.4th 921 (4th Cir. 2023) (prison medical death case citing *Mays*).

Unlike the referenced Fourth Circuit cases failing properly to raise the implications of *Kingsley* for pretrial detainees' medical claims, Ms. Lapp's claims against Dr. Inouye present the matter squarely.  Ms. Lapp respectfully invites this Court to "resolve this issue," and to  rule, consistently with *Kingsley* and, at last count, four circuits, that a pretrial detainee's claim of constitutionally inadequate medical care is to be adjudicated by an objective test of reasonableness, without regard to the alleged tortfeasor's state of mind.  As addressed at 26-27, *infra,* Dr. Inouye's motion fails *Farmer's* subjective as well as objective test, as "a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer* 511 U.S. at 842.  Since clarification of this issue will be needed for the jury to be instructed, it makes sense to address it now.

B.  Dr. Inouye Exposed Dr. Lapp to a Substantial Risk of Serious Harm[12]

A serious medical need is one "that has either been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Ms. Lapp does not repeat the incontestable record set forth at 2-3, *supra,* attesting to Dr. Lapp's illness.  That Dr. Lapp suffered from a major and debilitating psychiatric disorder was the conclusion of all six of the other psychiatrists and psychologists who assessed or treated him from 2018 to 2021: Drs.Wilson, DeRight, Armstrong, Graddy, Wood, and Pennuto.  They so concluded even if they did not all agree on his diagnosis: paranoid psychosis, bipolar I disorder, bipolar I disorder with psychotic (delusional) features, delusional disorder, etc.  Whatever its professionally favored technical name, there was no dispute that his disorder grossly impaired his functioning: it caused this M.I.T. Ph.D. to rob a bank and hijack a car at gunpoint, and for 2½ years thereafter precluded his meaningfully participation in his criminal defense.  Two months after being denied mental health care and the psychotropic medicine that had restored him to competence, he hanged himself, in the absence of any known traumatizing event that might have prompted his

---

[12]Dr. Inouye's focus on the unpredictability of Dr. Lapp's suicide misses the point.  The serious risk to which he exposed Dr. Lapp was that of psychiatric decompensation.  Everyone agrees it could not be predicted that Dr. Lapp would take his own life.  But what everyone  – including Dr. Inouye, in principle  – also agrees is that the withdrawal of mental health care and Dr. Lapp's restorative medication in particular enhanced the likelihood, not to say certainty, that Dr. Lapp's bipolar I disease would re-emerge, with all its negative consequences. Even Dr. Inouye recognized that  these risks included an enhanced risk of suicide. On Dr. Inouye's motion, the extent to which his withdrawal of care contributed to Dr. Lapp's suicide is a matter of damages, not liability.

suicide – no incident in the jail, no terrible news about friends or family.[13]  The fact that this final result could not be predicted does not nullify the causal or contributory relationship between the termination of Dr. Lapp's mental health care and his decompensation, with all its attendant consequences.

To this litany must be added the assessments of Ms. Lapp's two mental health experts: psychologist Michael Hendricks and psychiatrist Michael Clark, both of whom attest, not to the likelihood of suicide, but to the risks facing Dr. Lapp by reason of Dr. Inouye's termination of his mental healthcare and medications.  Here is Dr. Clark:

> Dr. Inouye did not perform an appropriate psychiatric examination, did not obtain relevant and accessible psychiatric information, and did not remain engaged with his patient through whatever mechanisms were available. Dr. Inouye actively decided to discontinue previously effective and accepted medications and inappropriately delegated his professional obligations to other unqualified staff (e.g. following up with the patient, obtaining outside psychiatric records).  As a result, Dr. Inouye breached the standard of care for [D]r. Lapp and through his negligence failed to perform an appropriate examination, make a correct diagnosis, and implement a specific treatment plan.  These deficiencies were directly related to and caused [D]r. Lapp's mental illness to worsen, his condition to go undetected and untreated, and his suicidality to emerge in a context of persecutory delusions.    * * *

> This case demonstrates the importance of carefully determining the presence of mental illness and the need to provide ongoing follow-up monitoring of the patient's degree of symptomatology to detect relapse early before the symptoms become severe, so that treatment can be initiated or modified to regain remission and remove the most significant factors associated with successful suicide.  In other words, *the prevention or elimination of suicide comes not from predicting its occurrence, but knowing suicide is an inherent manifestation of acute severe mental illness that is not likely to emerge if the patient's condition is treated to remission.*  Therefore, [D]r. Lapp's worsening of his psychotic psychiatric illness and subsequent suicide was causally related to the discontinuation of aripiprazole and mirtazapine by Dr. Inouye.

---

[13]A note left at his suicide repeated the claims about international intrigue that had for two years interfered with his ability to relate sensibly to his criminal charges. Exh. 34.

Exh. 32 at 4 and 6 (emphasis added).  And here is Dr. Hendricks:

> It is clear that Dr. Lapp was at heightened risk for suicide given the
> confluence of: (a) his diagnosis of Bipolar I Disorder, Manic with Psychotic
> Features (*N.B.*: the psychotic presentation is known to greatly exacerbate the
> risk of suicide attempt or completion); (b) the sudden cessation of the
> medication he had been taking in order to mitigate the most severe of his
> symptoms; (c) the ongoing fact that this was Dr. Lapp's first incarceration,
> which resulted in a substantial "fall from grace" given his academic and
> professional accomplishments (a fact that should have been taken into account
> by all who treated him); and (d) that he had just one month prior pleaded
> guilty to charges for which he would very likely be sentenced to prison for a
> period of years.

Exh. 30, ¶27 at 19-20.  And indeed, even as he terminated Dr. Lapp's mental health care and

medications, Dr. Inouye himself was concededly left with "unanswered questions" and the

belief that Dr. Lapp "would benefit from further assessment," Exh. 17 at 321:4-17; was

concerned that Dr. Lapp could have a recurrence of a manic episode, *id*. at 328:10-15; was

aware that the risk of suicide in bipolar I patients decreases if they are treated appropriately

with psychotropic medicine and receive follow-up care and monitoring, *id*. at 255:6-19; and

was aware that separation from family, fear of incarceration, and the approach of a

sentencing hearing could be risk factors for suicide. *Id.* at 256:2-9.  *See generally* ¶¶27-35,

*supra* at 8-11.

Ms. Lapp respectfully submits that the above renders untenable Dr. Inouye's request

for a ruling that as a matter of law, he did not, by any reasonable objective test, manifest

deliberate indifference to Dr. Lapp's serious mental health needs by removing him from

mental health care and medication as he did.  Whether he did so is for a jury to decide.

-25-

### C. Ms. Lapp's Claim Meets The Subjective
### Deliberate Indifference Test as Well

Adding a subjective test focusing on what Dr. Inouye actually understood does not

change the conclusion.  It is clear that at all relevant times Dr. Inouye knew, as a practicing

psychiatrist, everything he needed to know not to terminate Dr. Lapp's mental health care as

he did.  Admittedly not knowing "where to go," admittedly lacking sufficient information,

admittedly aware of the possibly serious adverse consequences for his patient, and in the

face of his own conceded concerns about his patient who he recognized might not be a

reliable historian, Dr. Inouye nevertheless proceeded summarily to terminate his patient's

course of treatment prescribed by a major mental health hospital and known to have returned

him to competence, based on the assurances of a delusional but glib patient, all without

soliciting available information to guide him in treating his patient properly.

Dr. Inouye's claimed ignorance that Dr. Lapp would kill himself is inconsequential to

his liability for having exposed Dr. Lapp to the risk, not to say certainty, of decompensation

and its unknown – and in this case tragic – consequences.  It is no surprise that Judge Ellis

stated his incredulity at Dr. Inouye's actions: "He's kept here [in Alexandria]; some

physician determines he doesn't need medication. I cannot imagine a physician making a

determination like that without knowledge of the medical records and the medical history,

and contact, maybe, between the doctor at Butner and here."  Exh. 24 at 12:1-5.  What Judge

Ellis – a man of law, not of medicine – understandably "[could] not imagine" epitomizes

circumstances in which "a factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at  842.  Ms.

Lapp respectfully submits that Dr. Inouye's termination of Dr. Lapp's mental health care and

medication was, as a matter of his own admissions, accomplished in the awareness of the serious risk associated with same.  His actions meet the *Farmer* test as well as the *Kingsley* test for liability.  A jury could find in a heartbeat that his actions manifested deliberate, indeed reckless, indifference to the fate of his patient, Dr. Lapp.

    III.  <u>Plaintiff's Expert Evidence is Properly Before The Court</u>

Since plaintiff's two experts criticize Dr. Inouye's treatment of Dr. Lapp and confirm the causal nexus between his actions and Dr. Lapp's decompensation and ultimate suicide, it is a matter of consequence for Dr. Inouye to bar the Court from considering their evidence on summary judgment.  But while a jury may prefer Dr. Inouye's experts to Ms. Lapp's at trial, such a conflict cannot be resolved by the Court on the motion at bar.

    A.  <u>Michael Hendricks, Ph.D.</u>

Dr. Hendricks was duly identified as an expert witness for Ms. Lapp on the day she was to identify her expert witnesses.  His report, including his *curriculum vitae,* appears as Exh. 30 and speaks for itself.  Dr. Hendricks has a clinical and forensic practice of psychology in the District of Columbia, Virginia, Maryland, as well as remotely elsewhere in states that permit it.  He was elected treasurer of the American Psychological Association in July 2023.  He has special expertise in psychopharmacology, having taught it at the graduate level.  Exh. 29 at 29:4-21. In the past, he has been asked by general medical practitioners for his recommendations for pharmacological treatment of certain mental illnesses. *Id.* at 66:8-19. At George Washington University he supervises students studying psychology.  *Id.* at 39:13-40:8.

Dr. Hendricks has pursued a special focus on the study of suicide, and is a long-standing member of the American Association of Suicidologists. *See* https://suicidology.org. He trained with some of the most prominent suicidologists in the country. *Id.* at 37:4-14. He reads the journal Suicide and Life-Threatening Behavior. *See* https://onlinelibrary.wiley.com/journal/1943278x. *Id.* at 144:24-145:25. In the period 1996-2000, acting as court-appointed Receiver at the D.C. Central Detention Facility (jail), he served as Chief of Outpatient Mental Health Services for that facility, where among other things he developed a jail-wide suicide prevention strategy. Details regarding his successful suicide-prevention work at the D.C. jail appear at Exh. 30, ¶3 at 2. For him to produce all his material on suicidology would require "a few boxes." Exh. 29 at 145:18-25. He has testified as an expert witness in Virginia, D.C. and Maryland and has given testimony in suicide cases. *Id.* at 152:17-153:10. He has been called by courts as an independent expert to discuss issues regarding standard of care. *Id.* at 152:20-153:3. He provided a written report in the case of *Porter v. Clarke, 290 F. Supp.* 3d 518 (E.D. Va. 2018), *aff'd* 923 F.3d 348 (4th Cir. 2019), in which both Judge Brinkema and the Fourth Circuit cited his work addressing the mental health consequences of permanent solitary confinement for death row inmates. Given his long-standing clinical practice addressing the issues here at bar, he is manifestly competent to present expert evidence on the adequacy and consequences of Dr. Inouye's attention paid to Dr. Lapp.

Dr. Inouye's objection that Dr. Hendricks does not meet the "knowledge requirement" because he is not a medical doctor is off the mark. This requirement "does not demand an identical level of education or degree of specialization; rather, it can be shown by

'evidence that the standard of care, as it relates to the alleged negligent act or treatment, is the same for the proffered expert's specialty as it is for the defendant doctor's specialty." *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 691 (4th Cir. 2011). In *Creekmore,* an obstetrician was permitted to testify that a nurse fell below the standard of care. He testified:

> [T]here is a great deal of things where [doctors and nurses] overlap, and I do exactly the same things that nurses do. So while I don't have an R.N., we take blood pressures the same way. We take pulses the same way. We examine uteruses the same way. We check for bleeding in the bed the same way. So I have been employed as a physician to do exactly the same things nurses do."

*Id.* at 692. The Fourth Circuit permitted the testimony, noting that "the inquiry focuses on the expert's knowledge of, and experience with, the specific procedure at issue, not on the expert's professional qualifications relative to those of the defendant practitioner." *Id.*

Just so here. On the issues of (1) whether it is necessary to secure desired and available material information about a patient who is receiving continuing care, including medication, for his mental illness, before summarily terminating such care and medication, (2) whether Dr. Inouye had enough information as it was not summarily to discontinue mental health care and medication of Dr. Lapp as he did, (3) whether it fell below the standard of care for Dr. Inouye to rely, as a basis for his professional actions, on the benign assessment of his patient with a longstanding history of mental illness and denial of same, 4) whether it was within the standard of care for him summarily to terminate Dr. Lapp's care and medication notwithstanding his having concerns for Dr. Lapp's well-being thereafter, and (5) how the risks of suicidality are enhanced by failure of appropriate mental health care and medication – ***on these issues***, Dr. Hendricks stands on a par with any psychiatrist – if not better informed than most by reason of his focus on suicidology. His testimony,

manifestly admissible under Fed. R. Evid. 702 and the strictures of *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), is equally admissible under Virginia law.[14] *See Conley v. Commonwealth*, 273 Va. 554 (2007) (social worker can testify to treatment of post-traumatic stress disorder ("PTSD")); *Velazquez v. Commonwealth*, 263 Va. 95 (2002) (sexual assault nurse can testify to causation in sexual assault case); *Fitzgerald v. Commonwealth*, 273 Va. 596 (2007) (professional counselor can render opinion regarding diagnosis of PTSD).

       B.  <u>Michael Clark, M.D.</u>

Dr. Clark was duly identified in timely fashion as an expert witness for Ms. Lapp. His report, including his *curriculum vitae,* appears as Exh. 32 and speaks for itself.  He was deposed at length by Dr. Inouye's counsel.  Dr. Inouye's attempt to dislodge Dr. Clark as Ms. Lapp's witness because he was initially identified as an expert witness by the United States is meritless. The cases to which he refers frown on a party's calling an adverse party's expert witness *against the adverse party who initially retained the expert*.[15]  Nothing of the

---

[14]*Creekmore v. Maryview Hosp.*, 662 F.3d 686 (4th Cir. 2011) holds that in a Virginia medical malpractice case in federal court pursuant to diversity jurisdiction, Virginia law determines the sufficiency of an expert's credentials to testify, and Ms. Lapp has briefed accordingly. On Ms. Lapp's constitutional claim against Dr. Inouye under 42 U.S.C. § 1983, the admissibility of her experts' testimony is decided under Fed. R. Evid. 702 and *Daubert* and its progeny. Pursuant to the federal standards, psychologists  – including those who, based on the case reports, had markedly lesser credentials than Dr. Hendricks –  have routinely been permitted to address claims against both psychiatrists and lay prison officials.  *See, e.g., A.H. v. St. Louis County*, 2016 WL 4269548 (E.D. Mo. Aug. 15, 2016) (jail suicide by hanging); *Williams v. Guadalupe, Texas,* 2006 WL 1767690 (W.D. Tex. Apr. 25, 2006) (jail suicide).

[15]*But see N. Shore Med. Ctr., Inc. v. Cigna Health & Life Ins. Co.*, 68 F.4th 1241, 1247 (11th Cir. 2023) (Jordan, J., concurring) ("no legal principle that precludes the plaintiff from relying on the opinion of a defense expert," and citing cases).  The government has not objected to Ms. Lapp's adoption of Dr. Clark's criticism of Dr. Inouye.

sort is here at issue. Dr. Clark's assessment of Dr. Inouye's negligence and liability for Dr.

Lapp's suicide is identical to that of Ms. Lapp and her own expert, Dr. Hendricks.  The case

of *Atl. Richfield Co. v. IMCO Gen. Const. Co.*, No. C01-1310L, 2005 WL 6762854 (W.D.

Wash. Jan. 27, 2005), relied on by Dr. Inouye, affirmatively supports Ms. Lapp.  Here, one

defendant retained an expert to opine on the standard of care that governed a co-defendant's

work. Since the two defendants had an "identity of interests," with regard to the expert's

subject matter, *id*. at *1, both defendants could use the witness.  The analysis in *Atl.*

*Richfield* applies here word for word:

> With respect to IMCO, the claims of Olympic and the Equilon defendants
> were virtually identical and IMCO has not alleged that Olympic's failure to
> disclose Mr. Nelson as a possible witness has caused prejudice. * * *  Equilon
> expressly acknowledges an identity of interests with Olympic regarding
> IMCO's liability and does not object to Olympic's use of Mr. Nelson at trial.
> * * * Given the past and present alignment of the parties and IMCO's inability
> to articulate any harm arising from Olympic's failure to disclose Mr. Nelson as
> an expert witness, Olympic will be permitted to call Mr. Nelson in its
> case-in-chief.

*Id.*  Dr. Inouye also ignores settled law that "either party may introduce the deposition of an

opposing party's expert if the expert is identified as someone who may testify at trial

because 'those opinions do not belong to one party or another but rather are available for all

parties to use at trial.'" *De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.*,

851 F. Supp. 2d 850 (E.D. Pa. 2012) (citing *Olsen v. Delcore*, No. 2:07-CV-334 TS, 2009

WL 3055411 at *1 (D. Utah Sept. 24, 2009).  *See also House v. Combined Ins. Co. of Am.*,

168 F.R.D. 236, 245 (N.D.Iowa 1996) ("[O]nce an expert is designated, the expert is

recognized as presenting part of the common body of discoverable, and generally

admissible, information and testimony available to all parties"); *Doe v. Eli Lilly & Co.,* 99

-31-

F.R.D. 126, 128 (D.D.C.1983) ("As a general proposition, ... no party to litigation has anything resembling a proprietary right to any witness's evidence.")

Nor will Dr. Clark's testimony "cause the jury to view the Plaintiff and the United States as collaboratively attacking Dr. Inouye," ECF 74 at 26.  Whatever "collaboratively" may mean, the government and Ms. Lapp *are* attacking Dr. Inouye in the identical manner. He cannot avoid this by complaining about it.  Regardless of who calls Dr. Clark to testify about Dr. Inouye, he will say the same thing, and without identifying who is paying him.

IV.  <u>Count III of the Complaint Should Go To The Jury</u>[16]

Count III of the complaint addresses Dr. Lapp's decompensation and resulting mental and emotional distress resulting from Dr. Inouye's termination of his mental health treatment and preceding his death.  No known crises or precipitating factors preceded Dr. Lapp's suicide. Observing that "Mentally stable persons do not, out of the blue and for no apparent reason decide to die by suicide," Exh. 30, ¶30 at 21,  Dr. Hendricks, a student and teacher of suicidology and psychopharmacology as well as a psychologist, opines:

> The denial of ongoing mental health intervention, including principally the psychotropic medications Dr. Lapp had begun taking at FMC Butner that restored him to competence, exacerbated his mental anguish arising from his mental illness, his incarcerated status, fall from grace, and his anticipated future incarceration.

*Id.*  Dr. Clark is in accord, noting, with reference to Dr. Inouye's breaches of the standard of care: "These deficiencies were directly related to and caused [D]r. Lapp's mental illness to

---

[16] Fairly read, all of Dr. Inouye's arguments address Dr. Lapp's suicide. Count III, which has not been challenged, should go to the jury.  New arguments cannot surface on rebuttal.  Ms. Lapp nevertheless addresses the merits.

worsen, his condition to go undetected and untreated, and his suicidality to emerge in a context of persecutory delusions." Exh. 32 at 4.

V.   Count IV for Wrongful Death, Should Go To The Jury

Dr. Inouye's motion claims that Ms. Lapp has defaulted in presenting evidence of causation. The contention is meritless, as Dr. Hendricks' proposed testimony addresses fundamental principles of treatment of persons with mental illnesses – something Dr. Hendricks has done for decades – *and with which Dr. Inouye largely, if not entirely, agrees in principle*, *see* ¶¶27-35, *supra*. To these truisms, Dr. Hendricks simply adds the truism that *not* doing what Dr. Inouye agrees is appropriate falls below the standard of care in treating mentally ill persons. As for Dr. Clark, Dr. Inouye's attack is exclusively procedural and has been rebutted by Ms. Lapp at 30-32. Dr. Clark's evidence is properly before the Court.

VI.  Ms. Lapp's State Law Claims Against Dr. Inouye, Whether Styled
     Claims for Negligence, Gross Negligence, or Willful and Wanton
     Negligence, and for Punitive Damages, Should Go To The Jury

Dr. Inouye's opposition to Ms. Lapp's state law claims, by whatever name, fails for reasons previously addressed in Ms. Lapp's statement of facts and in the discussion that follows. Knowing what he did not know and what information he sought from Butner but did not solicit; aware of Dr. Lapp's bipolar diagnosis and "presum[ing]" he was "probably prescribed medication by a psychiatrist"; "not surprised" that Dr. Lapp had been adjudicated incompetent; required by his agreement with the CSB as well as foundational professional obligations to provide complete psychiatric evaluations and diagnostic services to his patients, to "use the time allotted for initial psychiatric evaluations and medication

management in a manner that will ensure therapeutic environment and safety," and to "review client/patient clinical records to assure adequacy and proper prescription of medications"; aware that Dr. Lapp might not be a reliable historian and thus not sure "where to go"; on notice of various CSB assessments of Dr. Lapp as requiring mental health intervention; having his own concerns for his patient; believing and telling Dr. Lapp that he (Lapp) would likely be returned to the medications that Dr. Inouye proceeded to terminate; aware that suddenly stopping certain medication, including Abilify (aripiprazole), can lead to recurrence of bipolar disorder symptoms, and claiming that he would have tapered the 15 mg of Abilify to 10mg and observed Dr. Lapp "for several months" – this, with regard to medication he did not renew – and, at the most fundamental level, trained, as he necessarily was, in the elementary requirements of patient assessment and diagnosis – in the face of all this, Dr. Inouye summarily, ignorantly and recklessly terminated the successful mental health care regimen prescribed by a major mental health institution.  Respectfully, a jury could readily find that was not simply negligent or even grossly negligent conduct, but wanton and outrageous conduct by a professional who knew better.

Dr. Inouye responds that he offered "some degree of care." ECF 74 at 22.  What was that care?  That he read a few documents that alerted him to Dr. Lapp's multiple mental health problems and to what he should have done but didn't?  That he thought of asking an assistant to contact Butner but did not see that she (or anyone else) did so, nor contact Butner himself notwithstanding common CSB and Butner practices supporting the request for and release of such information?  That he asked his mentally ill patient for his diagnosis and accepted it? *See* Exh. 35.  Dr. Inouye had his patient close his umbrella in a rainstorm because the patient claimed not to be getting wet.  He did not even provide the dismissive

"take two aspirin and call me tomorrow."  He confiscated the aspirin.  This was not the

provision of "some" degree of care; it was the provision of no care.[17]  How, one might ask,

could he have provided *less* care than he did, which was to remove *all* care?  This sad state

of affairs is dispositive of Dr. Inouye's contentions regarding the various forms of

negligence to which he refers.  It is dispositive as well of the issue of punitive damages.

These matters are manifestly for a jury to assess.

<u>Conclusion</u>

For these reasons, Dr. Inouye's motion for summary judgment should be denied.

Respectfully submitted,

LISA LAPP,

By counsel

Dated:  September 29, 2023

Counsel for Plaintiffs:

<u>//s// Victor M. Glasberg</u>
Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
nsr@robinhoodesq.com
LappLisa\2BFiled\2023-0927-OppMSJ-Inouye

---

[17]The cases cited by Dr. Inouye to support his actions are woefully inapposite. None
involves the termination of previously mandated treatment, in the face, moreover, of conceded
lack of information and concerns on the part of the provider in question.  Page limitations
preclude review of all these cases, but perusal of each demonstrates its inapplicability.

Certificate of Service

      I, Victor M. Glasberg, hereby certify that on this 29th day of September 2023, I filed the foregoing Memorandum in Opposition to the Motion of Defendant Dean Inouye for Summary Judgment with the clerk of the court using the ECF system.

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

Counsel for Plaintiff