IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LISA LAPP,

*Plaintiff*,

v.

1:23-cv-00248 (MSN/LRV)

UNITED STATES OF AMERICA, *et al.*,
*Defendants*.

## **MEMORANDUM OPINION AND ORDER**

This case involves the tragic death of Dr. Christopher Lapp, who took his own life while in custody awaiting sentencing.

Lapp, a successful MIT-trained nuclear engineer, suffered from bipolar disorder with psychotic features. He was indicted in federal court after robbing a bank and committing an armed carjacking. At the outset of the criminal proceedings against him, Lapp was determined to be incompetent to stand trial. The Court committed Lapp to the custody of the Bureau of Prisons ("BOP") for evaluation and to eventually restore him to competency. A year and a half later, after complying with a new anti-psychotic medication regime, Lapp was transported back to the Alexandria Detention Center. He was thereafter declared competent and entered a plea of guilty.

After he had been transferred back to the Alexandria Detention Center, however, Lapp was seen by a psychiatrist—Dr. Dean Inouye—who declined to continue his prescriptions and never scheduled any follow-up treatment. Upon learning of this fact at the plea hearing—and concerned that the lack of continuity in Lapp's medical care could be detrimental to his competency—the Court ordered the United States Marshals Service ("USMS") to transfer Lapp back to the BOP facility where doctors had restored Lapp to competency, so that he could continue to be cared for until his sentencing. The government did not execute this order. Lapp took his own life a month later in his cell.

Lapp's estate brought this suit against the United States and Dr. Inouye, alleging that they are responsible for his death. Defendants moved for summary judgment on all claims. Because the transfer order did not create an independent duty of care that the United States owed Lapp for purposes of a tort claim, the Court will grant the United States's Motion for Summary Judgment. But because there are genuine issues of material fact as to whether Dr. Inouye's treatment of Lapp constituted malpractice and deliberate indifference, the Court will deny Dr. Inouye's Motion for Summary Judgment.

## I.    BACKGROUND[1]

### A.    Lapp's indictment and restoration to competency

On November 13, 2018, officers arrested Lapp after he committed an armed bank robbery and carjacking. He was indicted on various federal charges and detained at the Alexandria Detention Center ("ADC"). Dkt. 77-1 at 9-14; Dkt. 77-2 at 56. In criminal proceedings before Judge T.S. Ellis III, and on the unopposed motion of Lapp's counsel, the Court ordered Lapp committed to the BOP for a competency evaluation pursuant to 18 U.S.C. § 4241 on September 23, 2019. Dkt. 77-1 at 16-17. Following this evaluation, the Court determined Lapp was not competent to stand trial. *Id.* at 19-26. On January 29, 2020, the Court then committed Lapp to BOP custody pursuant to 18 U.S.C. § 4241(d) to determine whether he could be restored to competency. *Id.*

Lapp was admitted to the Federal Medical Center in Butner, North Carolina ("FMC Butner") on April 23, 2020. *Id.* at 38-39. He refused to take any psychotropic medication from the time of his admission through mid-September 2020. *Id.* at 54, 69, 74-75. In August 2020, Dr. Allyson Wood, an FMC Butner forensic psychologist, diagnosed Lapp with bipolar disorder, current episode manic, severe with psychotic features. *Id.* at 54. She noted that Lapp had limited

---

[1] The following facts are undisputed unless otherwise indicated.

insight into his mental illness, had refused psychotropic medication, and remained incompetent to stand trial. *Id.*

In response to a September court order requesting further analysis of whether the BOP recommended that Lapp be involuntarily medicated to restore his competency, FMC Butner Chief Psychiatrist Dr. Logan Graddy issued a supplemental report on September 23, 2020. *Id.* at 59-76. Dr. Graddy reported that Lapp had consensually begun taking an anti-psychotic medication (apiprazole). *Id.* at 73-76, 78, 84. In November, after complaining of "fractured sleep," Lapp was prescribed an additional medication (mirtazapine), which is indicated to treat sleep problems and major depressive disorder. *Id.* at 84, 99-102; Dkt. 94-1. Lapp continued to take both medications until his discharge from FMC Butner in February 2021. Dkt. 77-1 at 111.

On February 16, 2021, the FMC Butner Warden certified pursuant to 18 U.S.C. § 4241(e) that Lapp was able to understand the proceedings against him and to assist in his own defense. *Id.* at 106. The Warden relied on a February 12, 2021, forensic report by Dr. Wood, which noted that Lapp had been compliant with his medication regimen. *Id.* at 113. Dr. Wood emphasized that it was "imperative he be maintained on this regimen to prevent the likelihood of psychiatric decompensation as mental health symptoms wax and wane." *Id.* Lapp never expressed suicidal ideation to anyone at FMC Butner. *See id.*; *id.* at 56, 84.

**B.    Lapp's resumption of criminal proceedings**

Lapp was discharged from FMC Butner on February 26, 2021, to resume his criminal proceedings. Dkt. 77-2 at 2-7. His exit summary listed a variety of "health problems," including "Bipolar I Disorder: Current or Most Recent Episode Manic: In Partial Remission," as well as an "Other Unspecified Mental Disorder." *Id.* at 3. The exit summary also listed his medication regimen, specifying "[a]ll medication to be continued until evaluated by a physician unless otherwise indicated." *Id.* FMC Butner provided the officials who picked Lapp up for transport with a 14-day bridge supply of his medications. Dkt. 77-1 at 85.

Lapp arrived at the ADC on March 1, 2021. Dkt. 77-2 at 56. On March 2, 2021, a nurse practitioner signed for a six-page package of documents that included: (1) the "Prisoner in Transit Medical Summary," which noted Lapp's medications and that they were "dispensed with prisoner for transport;" (2) the exit summary from FMC Butner; (3) a USMS Prisoner Remand form; and (4) a form reflecting the doses of medications given to Lapp. *Id.* at 2-7; Dkt. 79-2 at 31. These documents were entered into the electronic medical record. Dkt. 78-3 at 2-12. The nurse practitioner entered a "bridge order" for Lapp's medications, which was intended to maintain him on the same medication regimen until he could see a mental health provider within a 14-day period. Dkt. 77-2 at 71-72; Dkt. 79-2 at 32-33, 37. Lapp was compliant with these prescriptions. *Id.* at 36.

On March 5, 2021, the Court determined that Lapp was competent to stand trial. Dkt. 77-2 at 84-85. At the same hearing, the Court appointed Joseph Flood as defense counsel for Lapp and accepted prior counsel's withdrawal of representation. *Id.* at 102. Three days later, Flood contacted Assistant U.S. Attorney ("AUSA") Maureen Cain to convey Lapp's interest in reviewing a plea offer. *Id.* at 108-09.

## C.    Lapp's visit with Dr. Inouye

On March 16, 2021, Dr. Inouye, a psychiatrist, attempted to interview Lapp but was unable to do so. *Id.* at 114. In his progress note, Dr. Inouye documented that Lapp's bridge prescription had expired the previous day. *Id.* Dr. Inouye's failure to see Lapp before the bridge prescription expired was contrary to procedure. Dkt. 78-3 at 28-29.

Dr. Inouye conducted a visit with Lapp two days later, on March 18, 2021. Dkt. 77-3 at 2-7. Dr. Inouye spent at least 20 minutes reviewing Lapp's records from both 2019 and 2021 prior to the visit, which included the transport package from FMC Butner. Dkt. 78-3 at 52; *id.* at 55-56. The records also included a "jail initial mental health assessment" from March 3, 2021, which indicated that Lapp had returned after engaging in competency restoration efforts; that he

4

had been diagnosed with bipolar disorder and prescribed anti-psychotic medication; and that Lapp did not agree with this diagnosis or the efficacy of the medication. Dkt. 77-3 at 9-10. That assessment further reported that Lapp "presented with disorganized thoughts and would make vague statements about 'evidence' [and] 'threats from overseas.'" *Id.* The records from 2019 included the same impression that Lapp may be experiencing delusions. *Id.* at 12, 14-15.

During his visit, Dr. Inouye documented that Lapp "presented in an organized and even manner" and expressed "no irritable or depressed mood or excessive anxiety." *Id.* at 4. According to his notes, Dr. Inouye "counseled [Lapp] that [he] was not going to resume his previous [anti-psychotic medication] dose due to a lack of current, clinical indication or supporting documentation from Butner, and [Lapp] concurred." *Id.* Dr. Inouye categorized Lapp's reliability of self-reporting as "good." *Id.* at 5. Dr. Inouye later testified, however, that during this visit he told Lapp he could resume his medication, but Lapp did not want to. Dkt. 74-11 at 23-24. He testified that Lapp denied having any symptoms of depression or ever having a manic episode, and Lapp did not want to take any medications because he did not believe he had bipolar disorder. *Id.* at 18-19.

At no point did Dr. Inouye contact FMC Butner to obtain additional information about Lapp's diagnosis or treatment, nor did he direct anyone else to do so. Dkt. 78-3 at 58-59, 61-62. Despite his decision to discontinue Lapp's anti-psychotic medication, Dr. Inouye had concerns about Lapp's mental health and thought he would benefit from mental health services. *Id.* at 70. But Dr. Inouye did not request a follow-up appointment with Lapp or otherwise monitor the status of his mental health. *Id.* at 71-72, 75. Nor did he recommend anyone else to follow-up or provide treatment to Lapp. *Id.* at 66, 71-72, 75.

### D.    Lapp's guilty plea

Dr. Michael Hendricks, a psychologist, was retained by Lapp's counsel to assess his competency to plead guilty or proceed to trial, and to advise as to how to ensure he maintained

5

his competency throughout the proceedings. Dkt. 79-2 at 6, 44-45. Hendricks met with Lapp for a total of six hours on March 24 and March 26, 2021. *Id.* at 62. He agreed with Dr. Wood's diagnosis of bipolar disorder with delusional content. *Id.* at 48-50; Dkt. 77-3 at 81-82. Lapp informed Hendricks that Dr. Inouye had discontinued his psychotropic medications. Dkt. 79-2 at 54. Hendricks concluded that Lapp was competent during these visits, but without medication, Hendricks had "little confidence that [Lapp] would remain competent." *Id.* at 45-47. He was concerned that Lapp would decompensate and reported this concern to Lapp's counsel, Flood, warning him of "issues about potential deterioration … which could render [Lapp] incompetent." *Id.* at 8.

While Lapp was detained at the ADC, Flood met in-person with him two or three times and spoke with him on the phone five or six times. *Id.* at 9. Flood observed symptoms of Lapp's mental illness during these conversations, and he encouraged Lapp to resume his medication, but Lapp did not agree to do so. *Id.* at 10-13; 17. After his last in-person visit with Lapp in mid-April 2021, Flood asked an unnamed correctional officer to "keep an eye on Mr. Lapp." *Id.* at 21.

On April 16, 2021, Lapp returned to court for a change of plea hearing. In response to questions during the plea colloquy, Lapp informed the Court that he was no longer taking any medication for his bipolar disorder but that he felt capable of making decisions about his future. Dkt. 77-3 at 106, 108. Flood stated that he was "fully satisfied" that Lapp was competent and that he had "no question" regarding his competence. *Id.* at 97. Lapp admitted to the charges, and the Court accepted the plea, finding that Lapp was "fully competent and capable of entering an informed plea." *Id.* at 141. Sentencing was set for nearly six months later: October 8, 2021. *Id.* at 144.

During the change of plea hearing, the Court indicated that it would "issue an order that directs the [M]arshals to return [Lapp] to Butner" to ensure that Lapp would be "cared for medically thoroughly." *Id.* Judge Ellis then entered a sealed order ("the April 16 Order") that

provided "the United States Marshals Services is DIRECTED promptly to return defendant to FCI Butner[2] so defendant may remain under the care of Dr. Graddy" in order "[t]o ensure continuity of treatment and mental health care." *Id.* at 148.

### E.    Lapp's suicide

USMS received the April 16 Order three days later, and it was entered into the system through which USMS and BOP coordinate the transportation of prisoners. *Id.* at 156-58; Dkt. 79-1 at 65-66. A BOP employee reviewed the Order and forwarded it to counsel after determining that Lapp had pled guilty but had not been sentenced or ordered for a mental health evaluation or study. Dkt. 79-1 at 80-85, 88-89, 91-92. On May 5, 2021, the BOP employee informed USMS that "[p]er attorney we are not able to follow this order as he is not a study nor a BOP inmate at this time." Dkt. 77-3 at 156. The employee then closed the case in the system. *Id.*

Butner staff similarly concluded that the April 16 Order could not be followed as written, because Butner only accepted pre-trial inmates who had been ordered for a mental health study pursuant to 18 U.S.C. §§ 4241-4248. Dkt. 79-1 at 29-30. On April 20, 2021, the Deputy Chief of Psychology at FMC Butner emailed the Assistant United States Attorney and Lapp's counsel to ask whether "there will be a corresponding order for further evaluation of Mr. Lapp prior to sentencing such that he is in a study status for ongoing treatment." Dkt. 78-1 at 5. Over the phone, the Deputy Chief explained to them that Lapp was ineligible to return to Butner in the absence of a court order requiring further mental health evaluation. *Id.* at 9; Dkt. 79-1 at 10. A BOP senior attorney reiterated the same information. Dkt. 78-1 at 12.

One week after the April 16 Order, Flood filed a notice with the Court, stating that "Butner will not receive Dr. Lapp for additional pretrial treatment absent a finding of incompetence or an order directing a statutorily recognized evaluation, as Butner is not a pretrial

---

[2] FCI Butner refers to the non-medical custodial facilities located at the Butner Federal Correctional Complex.

facility and accepts inmates for the express purpose of conducting court-ordered evaluations." *Id.* at 19. No further action was taken by the parties or the Court. *See generally United States v. Lapp*, 1:19-cr-99-TSE, (E.D. Va.).

Lapp did not receive any mental health care at the ADC or take any psychotropic medications after his guilty plea. Dkt. 77-3 at 93. Lapp hung himself in his cell on May 18, 2021, and died later that day. Dkt. 78-1 at 22.

After Lapp's death, Judge Ellis ordered the BOP to show cause why Lapp had not been accepted for treatment as directed by the April 16 Order. At the show cause hearing, Judge Ellis emphasized that "there was no doubt that his medication was important …. [W]hatever medication he was on was something that had brought him back to competency and it ought to have been continued. That's why I sent him back to Butner." Dkt. 83-7 at 14-15. BOP counsel explained it did not accept Lapp's transfer because it only has statutory authority to take custody of a pretrial defendant for the limited time outlined in 18 U.S.C. § 4247(b). Judge Ellis issued a subsequent order disagreeing with BOP's position, stating that the April 16 Order was "proper legal authority for FMC Butner to have accepted [Lapp] for continued treatment and receipt of medication." Dkt. 83-28 at 2.

F.   **Procedural History**

Lisa Lapp, acting as representative of Dr. Lapp's estate, brought this suit against the United States and Dr. Inouye.[3] As to the United States, Plaintiff brought four claims under the Federal Tort Claims Act ("FTCA"): Count I—"Survival Claim For Violation of Court Order;" Count II—"Wrongful Death;" Count V—"Failure to Provide Records Resulting in Pain and Suffering;" and Count VI—"Failure to Provide Records, Resulting in Death." *See* Dkt. 5. As to

---

[3] Lapp's daughter, J.L., also joined the suit as a plaintiff. The Court dismissed J.L. as an improper party in its order on June 2, 2023. *See* Dkt. 35.

Dr. Inouye, Plaintiff brought two claims: Count III—"Eight or Fourteenth Amendment Survival Claim For Pain And Suffering" and Count IV—"Wrongful Death." *Id.*

The United States moved to partially dismiss the claims against it, arguing that Plaintiff's FTCA claims should be dismissed to the extent they are premised upon the alleged actions or inactions of the AUSAs involved in Lapp's case. *See* Dkt. 20; 21. The Court granted that motion, dismissing any claims against the AUSAs. *See* Dkt. 35.

After discovery, Defendants moved for summary judgment on all claims, and Plaintiff moved for summary judgment on liability against the United States. At the motions hearing, the Court dismissed Counts V and VI (the claims concerning the government's failure to provide records) against the United States for lack of jurisdiction, and it denied Plaintiff's motion for summary judgment on liability against the United States. The Defendants' remaining motions for summary judgment are now ripe for resolution.

## II.    STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material "if it might affect the outcome of the suit under the governing law." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). The Court may not consider inadmissible evidence on a motion for summary judgment. *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023).

### III.     ANALYSIS

#### A.     Dr. Inouye's Motion for Summary Judgment

Dr. Inouye moved for summary judgment on both claims against him—(1) a Section 1983 claim for deliberate indifference, and (2) a wrongful death claim under Virginia law. Because there are genuine issues of material fact as to both claims, Dr. Inouye is not entitled to summary judgment.

As an initial matter, Dr. Inouye argues that Lisa Lapp is not a proper plaintiff because she waived her right to serve as an administratrix of Dr. Lapp's estate when she signed their separation agreement, which contained a provision whereby the Lapps agreed to relinquish all rights to act as an executor of the other's estate. This argument has no merit because Plaintiff was lawfully appointed pursuant to Va. Code § 64.2-454. That statute provides for appointment of an administrator by a Virginia circuit court "solely for the purpose of prosecution or defense" of a wrongful death suit arising within the Commonwealth of Virginia. To the extent the Lapps' separation agreement should have precluded Lisa Lapp's appointment under Va. Code § 64.2-454, the time to make that argument has passed. Dr. Inouye cannot now challenge that appointment in federal court. *See generally District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).[4]

#### i.     Constitutional Claim

Count III alleges that Dr. Inouye violated Lapp's constitutional right to be free from deliberately indifferent medical care while detained. Lapp brought this claim under 42 U.S.C. § 1983, arguing that this right arises under either the Eighth or Fourteenth Amendment of the Constitution. Dr. Inouye argues, and the Court agrees, that Lapp's right arises under the Fourteenth Amendment because at the time Lapp was treated by Dr. Inouye, Lapp "was a

---

[4] The United States did not advance this argument and declined the opportunity to do so at oral argument.

'pretrial detainee and not a convicted prisoner.'" *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)). "As a pretrial detainee, [Lapp] cannot be subject to any form of 'punishment,'" so the Eighth Amendment does not apply. *Id.*

The Court must address a threshold issue before turning to the evidence. Historically, a claim for deliberate indifference required showing that the defendant *actually knew of and ignored* (the subjective prong) a detainee's serious need for medical care (the objective prong). *See White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) ("A claim of deliberate indifference … implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice."). In the wake of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), however, which held in the excessive force context that a pretrial detainee was required to show only that the force used was objectively unreasonable, there is a circuit split as to whether *Kingsley* altered the deliberate-indifference standard for claims concerning pretrial detainees' serious medical needs, by turning it into a purely objective inquiry.[5] The parties now dispute whether Plaintiff must still establish a subjective element.

After the Court held argument on the motions, however, the Fourth Circuit resolved this open question. It held that after *Kingsley*, "it is sufficient that the plaintiff show that the defendant's action or inaction was … 'objectively unreasonable.'" *Short v. Hartman*, -- F.4th --, No. 21-1396, at 28 (4th Cir. Dec. 8, 2023) (slip op.) (quoting *Kingsley*, 576 U.S. at 397). The Court must therefore apply this precedent.

---

[5] *Compare Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (adopting a completely objective standard); *Miranda v. Cnty. Of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (same); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (same), *with Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 & n.4 (5th Cir. 2017) (continuing to require a subjective element); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (same); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same).

Turning to the evidence, Dr. Inouye has failed to establish that he is entitled to summary judgment on this claim. There is a genuine dispute of fact as to whether Dr. Inouye either knowingly or recklessly disregarded Lapp's need for psychiatric medication and treatment.

First, there is substantial evidence that Lapp had a serious need for medical care. A serious medical need is one "that has either been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Given that Lapp had just spent ten months at FMC Butner, the BOP's most well-known medical facility, for the sole purpose of regaining competence to stand trial—competence which was only restored after Lapp began taking anti-psychotic medication—it cannot seriously be disputed that Lapp had a "medical condition … that posed a substantial risk of serious harm." *Short*, slip op. at 27; *see* Dkt. 77-1 at 38-114.

Second, there is a genuine issue of fact as to whether Dr. Inouye either "knowingly" or "recklessly" disregarded "the risk that the condition posed." *Short*, slip op. at 28. There is evidence that Dr. Inouye was aware of Lapp's diagnosis and, at least to a certain extent, his prolonged treatment at Butner, where Lapp's competence was restored only after he began an anti-psychotic medication regime. Dkt. 74-11 at 10-11. There is also evidence that, despite this context, Dr. Inouye either disregarded the seriousness of Lapp's psychiatric condition or simply acquiesced to Lapp's suggestion that he discontinue his medication, even though Lapp was not experiencing any side effects. *See, e.g.*, Dkt. 77-3 at 4 (noting that Dr. Inouye "counseled [Lapp] that [he] was not going to resume his previous [anti-psychotic medication] dose due to a lack of current, clinical indication"); Dkt. 74-11 at 165:3-166:21 (Dr. Inouye's testimony that Lapp did not want to take medication because he did not believe he had bipolar disorder). Despite knowledge of Lapp's extensive psychiatric history and the potential implications of withdrawing anti-psychotic medication that had restored Lapp to competency, there is evidence that Dr.

12

Inouye made no effort to ensure any follow up on Lapp's well-being. *See, e.g.*, Dkt. 78-3 at 71-72. Taken together, this evidence is sufficient to create a genuine issue of fact as to whether Dr. Inouye was deliberately indifferent to Lapp's serious need for psychiatric treatment.[6]

### ii.    Wrongful Death Claim

Count IV alleges that Dr. Inouye is liable for damages resulting from Lapp's wrongful death under Va. Code. § 8.01-50 *et seq.* because of his "reckless and grossly negligent withdrawal of Dr. Lapp's psychotropic medications." Dkt. 5 ¶ 79. Dr. Inouye's sole argument supporting summary judgment on this claim is a technical, rather than substantive, one. He argues that Plaintiff has not satisfied the expert requirements under Virginia law for a medical malpractice claim to prevail. But because Plaintiff can satisfy those requirements, Dr. Inouye is not entitled to summary judgment on this claim.

Virginia law contains stringent expert requirements for medical malpractice claims. As to establishing the standard of care, Virginia law requires that in "any action against a physician … to recover damages alleged to have been caused by medical malpractice … the standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth and the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted." Va. Code. § 8.01-581.20. That statute further specifies that "[a]ny health care provider who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of practice in which he is qualified and

---

[6] Dr. Inouye principally argues that Lapp had "a right to refuse medical treatment, including … prescription medication." Dkt. 74 at 21. But the record is not at all clear that Dr. Inouye acquiesced to Lapp's *refusal* to take medication as opposed to Lapp's suggestion that he would prefer not to take it. *See* Dkt. 74-11 at 330:7-8; 331:3-5. In fact, Dr. Inouye's notes of his visit with Lapp even suggest that it was Dr. Inouye's suggestion, not Lapp's, to discontinue the medication, stating: "I counseled him that I was not going to resume his previous aripiprazole dose due to a lack of current, clinical indication or supporting documentation from Butner, *and he concurred.*" Dkt. 77-3 at 4 (emphasis added). This conflicting evidence in the record creates a genuine issue of material fact.

certified." *Id.* And a "witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action." *Id.* Moreover, only a physician can offer expert testimony on causation under Virginia law. *John v. Im*, 559 S.E.2d 694, 697 (2002).

Dr. Inouye argues that Plaintiff cannot satisfy either of these expert requirements for her wrongful death claim because Plaintiff's only retained expert to testify on these issues, Dr. Hendricks, is not a psychiatrist who has a medical degree but rather a psychologist who does not. Although it may be true that Plaintiff cannot satisfy these requirements relying solely on Dr. Hendricks, that is not all the admissible expert testimony in this case.[7] The United States's retained expert, Dr. Michael Clark, is a psychiatrist who is indisputably qualified to provide expert testimony as to the standard of care and causation for this claim. And Dr. Clark has offered an opinion that supports Plaintiff's claim: he opines that "Dr. Inouye did not perform an appropriate or comprehensive evaluation of Mr. Lapp;" "[t]his failure to meet the standard then directly resulted in not being able to engage in appropriate clinical decision making;" and "Lapp's worsening of his psychotic psychiatric illness and subsequent suicide was causally related to the discontinuation of aripiprazole and mirtazpine by Dr. Inouye." Dkt. 92-32.[8]

---

[7] Because Dr. Hendricks cannot legally prescribe medication, and because one of the critical decisions here was Dr. Inouye's decision to discontinue prescribing medication to Lapp, Dr. Hendricks cannot establish the proper standard of care as to that decision through his testimony. *See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 692 (4th Cir. 2011) (noting the critical distinction is whether the expert "performs the procedure at issue"). Nor can he offer testimony as to whether that decision caused Lapp's death. *See John*, 559 S.E.2d at 697. However, given his background focusing on suicidality in detention facilities, Dr. Hendricks is perhaps uniquely qualified to provide expert testimony as to other issues in this case. *See* Dkt. 92-29 at 145:18-25; Dkt. 92-30.

[8] Plaintiff disclosed that she may call Dr. Clark as a witness. *See* Dkt. 60. Dr. Inouye argues that Plaintiff declined to adopt Dr. Clark's opinions on causation (Dkt. 74 at 28 n.5), but that misrepresents Plaintiff's disclosure. Plaintiff simply declined to adopt Dr. Clark's opinions

Dr. Inouye objects to Plaintiff's reliance on the government's expert as "improper." But "[t]here is no per se rule precluding a plaintiff from calling a defendant's expert in their case-in-chief." *Labat v. Rayner*, 2022 WL 1442982, at *2 (E.D. La. May 4, 2022) (citing *Kerns v. Pro-Foam of S. Ala., Inc.*, 572 F. Supp. 2d 1303, 1309 (S.D. Ala. 2007)). Rather, "the decision to allow a party to call an opposing party's witness in support of its own case-in-chief is 'committed to the discretion of the trial court.'" *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 2021 WL 4338973, at *11 (C.D. Cal. Aug. 13, 2021). The circumstances here are not like the cases Dr. Inouye cites, where courts exercised their discretion to bar plaintiffs from calling defendants' experts because it would allow plaintiffs to piggyback on another party's trial preparation. *See, e.g.*, *Labat v. Rayner*, 2022 WL 1442982, at *2 (E.D. La. May 4, 2022). Although the United States is an opposing party to Plaintiff, the United States is not a party at all to the claims concerning Dr. Inouye. While Dr. Inouye claims the jury would be "confuse[d] and prejudice[d]" by hearing the government's expert testify in Plaintiff's favor, the Court disagrees. If anything, as an expert initially retained by neither party at issue in the claims before the jury, the jury could find Dr. Clark more credible.

Because there is expert testimony by a psychiatrist that the Plaintiff may introduce to support her wrongful death claims, Dr. Inouye is not entitled to summary judgment.

### B.    The United States's Motion for Summary Judgment

Lapp asserts two claims against the United States: (1) an "FTCA Survival Claim for Violation of Court Order" pursuant to Va. Code § 8.01-25, which seeks damages for "Lapp's pain and suffering prior to his death;" and (2) an "FTCA Claim for Wrongful Death" pursuant to Va. Code § 8.01-50. FAC ¶¶ 77-78. The United States moved for summary judgment on both claims, principally arguing that Lapp cannot establish the elements of "breach and causation."

---

"regarding the issue of 'intervening cause'"—that is, his opinion that Dr. Inouye's alleged negligence superseded the alleged negligence of the United States.

Dkt. 77 at 18.[9] The Court agrees that the government's failure to return Lapp to Butner or otherwise alert Judge Ellis of its intention not to do so was not a breach of any tort duty that the United States owed Lapp.

It is worth pausing to reiterate Lapp's remaining viable theories. The Court has already dismissed—on grounds of prosecutorial immunity—any claims predicated on the failure of the AUSAs involved in Lapp's criminal proceedings to move to vacate or amend the April 16 Order. *See* Dkt. 35. Lapp's remaining theory is that the failure of the BOP and the USMS to execute the April 16 Order—by transporting Lapp to Butner so he could receive medical treatment from his previous providers there—caused Lapp pain and suffering, and ultimately his death. As this theory goes, the BOP and the USMS owed Lapp a duty to either "abide by the [April 16 Order] or to secure relief from the affirmative obligations imposed on them by the [April 16 Order]," the latter of which Plaintiff argues would have prompted Judge Ellis to issue a separate order that would have prevented Lapp's death. Dkt. 93 at 9.

These claims boil down, as a threshold matter, to whether tort liability may attach to the noncompliance with a court order. Put differently, does a judicial order impose on its subjects an independent duty of care towards that order's purported beneficiaries for purposes of tort liability, such that failure to abide by that order constitutes negligence? Because Virginia law does not establish that a judicial order creates an independent duty of care for purposes of tort liability, there is no genuine issue of material fact as to whether the United States breached a duty of care to Lapp. The United States is therefore entitled to summary judgment.[10]

---

[9] The United States also argued that Lapp's wrongful death claim was barred under Virginia law because "suicide is an illegal act" and therefore "a per se bar to a wrongful death claim" so long as the decedent was "competent and sane" at the time of his death. *Hill v. Nicodemus*, 979 F.2d 987, 990 (4th Cir. 1992). The Court need not reach this argument because the United States is entitled to summary judgment regardless for the reasons explained below.

[10] Because the Court resolves the motion on this ground, it will not wade into the arguments concerning whether there are genuine issues of material fact as to whether the government's failure to execute or seek relief from the April 16 Order caused Lapp's death.

In analyzing an FTCA claim, the Court "applies the substantive law of the state where the alleged tort took place." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009). In Virginia, a negligence claim is actionable where there is a legal duty and a violation of that duty, which causes injury. *Chesapeake & Potomac Tel. Co. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). The Supreme Court of Virginia has held that "the duty tortiously or negligently breached must be a common law duty," and "not one existing between the parties solely by virtue of … contract." *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293 (Va. 2007).

Plaintiff's theory that the April 16 Order created an independent tort duty—owed to Lapp—for the government to execute that Order, rests on a single federal case that applies Virginia law: *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir. 1976). In that case, the state court suspended an individual's twenty-year sentence conditioned on his continued confinement and treatment at a psychiatric facility. *Id.* at 123. The judicial order specified that the individual was to remain in defendants' custody until released by further court order. *Id.* at 125. Without notifying the court, the defendants released the individual, who then murdered the plaintiff's daughter. *Id.* at 124. The Fourth Circuit held that the judicial order—which delineated the terms of the individual's custody—created the kind of "special relationship" contemplated in Restatement (Second) of Torts § 319, whereby a custodian has a duty of care to "exercise control [of] the third person to prevent him from doing" reasonably foreseeable harm. *Id.* at 125.

*Semler* concerns different circumstances than the ones here, and it does not control the analysis. Nor does it establish that, under Virginia law, a judicial order creates an independent tort duty to comply with said order. Rather, *Semler* merely applies traditional tort principles to properly extend a tort duty to a third-party plaintiff. And in *Semler*, a judicial order was relevant to that application because it marked the terms of the dangerous person's custody.

17

The Supreme Court of Virginia has endorsed this understanding of *Semler*. While declining to "decide whether *Semler* correctly applies the law of Virginia," the Supreme Court of Virginia explained that *Semler* "[r]el[ied] on § 319 of the Restatement" to conclude that the court's custodial order "created a special relationship and imposed a duty on the [defendants] to exercise reasonable care to protect the public from harm." *Fox v. Custis*, 372 S.E.2d 373, 377 (Va. 1988). The "standard of care had been 'delineated by the precise language of the court order'" only insofar as the order dictated the terms of the individual's custody—that is, he was "to remain in custody until released by further court order," and until such time, defendants had a duty to protect the public from foreseeable harm at the detainee's hands. *Id.*

Moreover, Virginia courts have, post-*Semler*, held that violation of a judicial order does not necessarily mean that there has been a breach of a tort duty. The Supreme Court of Virginia recently held that although the defendants had allegedly "violated court orders in selecting mental health professionals without [plaintiff's] approval" and had "refus[ed] to permit [plaintiff] visitation in violation of a court order," the plaintiff had failed to state a tortious interference claim. *Padula-Wilson v. Landry*, 841 S.E.2d 864, 871 (Va. 2020). Although those judicial orders did not create a tort duty for defendants, plaintiff nonetheless "could have availed herself of contempt and other remedies to correct the problem, by alerting the court that its order was being violated and asking for that violation to be remedied." *Id.* In another case, a Circuit Court of Virginia held that no duty existed in circumstances where a custodian violated a court order. *See Marshall v. City of Richmond*, 15 Va. Cir. 264, 1989 WL 646153 (1989) (applying *Semler* and holding that the "mere fact" of court-ordered incarceration did not trigger a duty on the part of the custodian to protect third parties absent a link "to some specific person or class of discernible victims"). In other words, these Virginia cases stand for the proposition, consistent with *Semler*, that a judicial order does not itself, without more, create a tort duty to comply with that order. Rather, it is ordinary tort principles that govern whether a duty exists. And Lapp has not pointed

18

to any Virginia case that stands for the proposition that a judicial order *ipso facto* creates a tort duty.

Instead, Lapp points to two other states that, she argues, "join Virginia in finding an actionable tort when violation of a court order results in injury." Dkt. 83 at 16 n.13. But neither of those cases stands for that proposition. In *Faile v. South Carolina Dep't of Juv. Just.*, 566 S.E.2d 536, 548 (S.C. 2002), the South Carolina Supreme Court held that because the defendant "had custody of a known dangerous individual," such custody meant that "[i]t had an *independent* duty to control and supervise [the dangerous individual] to prevent him from harming others." 566 S.E.2d at 548 (emphasis added). And in *Caldwell v. Idaho Youth Ranch, Inc.*, the Supreme Court of Idaho similarly held that whether a duty existed depended entirely on whether the dangerous individual was in the defendant's custody. 968 P.2d 215, 219 (Idaho 1998) ("[W]hether Espinoza was in the custody and control of the Youth Ranch at the time of Caldwell's murder is dispositive.").

Again, in neither of these cases did a judicial order itself *create* an operative tort duty. Rather, the relevant duty in all of these cases was "independent" of the judicial order and instead linked to the "special relationship" between the custodian and the public when a dangerous individual is in custody. *Faile*, 566 S.E.2d at 547-58. While judicial orders are often relevant to determining when an individual is in a particular entity's custody, thus potentially delineating a "special relationship" under § 319 of the Restatement, the orders themselves do not trigger a separate duty—for tort purposes—to comply with the order. *Id.* at 548 ("*Semler* does not equate the [Restatement § 319] duty with the 'custodial entity's duty to obey court orders.'").

Finally, Lapp points to two out-of-circuit district court cases to argue that "FTCA liability attaches when federal actors ignore court orders," but those cases are not like the circumstances here. Dkt. 93 at 15. In *Avalos-Palma v. United States*, 2014 WL 3524758 (D.N.J. July 16, 2014), the court allowed a negligence claim to survive a motion to dismiss when the government

19

deported the plaintiff notwithstanding that a federal regulation required a stay. Unlike here, however, the government did not disregard a judicial order in *Avalos-Palma*. It disregarded a regulatory obligation grounded in federal statute, and under New Jersey law, a tort duty "may be imposed by statute." *Id.* at *11 (quoting *Sinclair v. Dunagan*, 905 F. Supp. 208, 213 (D.N.J. 1995)). Similarly, in *Turnbull v. United States*, 2007 WL 2153279 (N.D. Ohio July 23, 2007), the government deported the plaintiff notwithstanding a magistrate judge ordering a stay. But in that case, only claims involving emotion distress survived, and the court never grappled with whether the stay order triggered a duty of care to the plaintiff for purposes of a negligence claim, such that disregard of the stay would constitute negligence *per se*. *See id.* at *9-10. In any event, neither of these cases deal with Virginia law.[11]

*     *     *

Accordingly, it is hereby

**ORDERED** that Dean Inouye's Motion for Summary Judgment (Dkt. 73) is **DENIED**; and it is further

---

[11]   Regardless of tort liability, there can be serious consequences for a party who disregards a court order. It is settled that a judicial order, regardless of the validity of its legal basis, must be obeyed until it is stayed or set aside on appeal. *See Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("If a person to whom a court directs an order believes that order is incorrect, the remedy is to appeal; but absent a stay, he must comply promptly with the order pending appeal."). Courts have a variety of tools at their disposal to enforce their orders, from their inherent contempt power to the authority to issue sanctions under the Federal Rules. *See, e.g.*, *Willy v. Coastal Corp.*, 503 U.S. 131, 139 n.5 (1992) (holding that lower courts have the power to issue Rule 11 sanctions even when they do not have subject-matter jurisdiction over the underlying controversy); *United States v. Barnett*, 376 U.S. 681, 699-700 (1964) ("The power to fine and imprison for contempt … is a power inherent in all courts of record."); *Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.*, 266 U.S. 42, 65-66 (1924) (noting that the judicial contempt power is "settled law" and "essential to the administration of justice").

These tools were available here too, but the parties to Lapp's criminal proceedings chose not to ask the Court to deploy them. As the Supreme Court of Virginia has explained, however, "[i]f the defendants were violating a court order, [plaintiff] could have availed herself of contempt and other remedies to correct the problem." *Padula-Wilson*, 841 S.E.2d at 871.

**ORDERED** that the United States's Motion for Summary Judgment (Dkt. 76) is **GRANTED**.

<b>SO ORDERED.</b>

_____
/s/
Michael S. Nachmanoff
United States District Judge

December 13, 2023
Alexandria, Virginia